# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-51330

United States Court of Appeals
Fifth Circuit

**FILED**
January 5, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SEAN JAMES HAGER,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:15-CR-108-1

Before DENNIS, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:*

Defendant Sean Hager was a long-time salesperson for Velocity Electronics ("Velocity"), a computer parts distributor in Austin, Texas. From 2008 to 2012, he misused Velocity's confidential information to perpetrate a scheme that netted him $1.16 million. Hager was charged and convicted of mail, wire, and tax fraud, as well as money laundering. He raises numerous

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-51330

legal issues on appeal, but none is persuasive. We affirm his conviction on all charges.

I.

Velocity is essentially a middle-man broker: it buys computer parts on the open market from suppliers and then resells them at a 20% markup to clients based on their specific needs. Velocity uses an in-house proprietary software system ("VIS") to store and organize crucial business information, including its suppliers, clients, inventory, and past sales. The VIS aggregates and analyzes information about pricing—both the prices at which it purchases products, and the prices at which it sells products. The software generates pricing trends that can be organized by client and product, and it sets purchasing and selling price quotes that ensure a 20% profit margin. This quote establishes a "fail point," meaning employees cannot enter price quotes resulting in a lower margin unless a manager manually overrides the software.

Velocity considers the information contained within the VIS to be confidential and makes this clear to its employees: employees sign multiple confidentiality agreements upon hiring; the employee manual expressly designates information contained in the VIS as confidential; and the importance of keeping the information confidential is "discussed frequently." The confidentiality of its profit margin is particularly important because the release of this information would severely compromise its negotiations with clients.

Hager was a well-respected Velocity employee. He was the salesman responsible for Dell, one of the company's most important clients. But Hager came to believe that Velocity did not have his "long-term interests at heart." In 2008, he decided to take advantage of his access to the company's confidential information for personal gain. Hager formed a company called Echt Electronics ("Echt") in his wife's name. He used Echt to buy parts he knew Velocity needed

2

because he was aware of which parts Dell was ordering. He would then sell those parts to himself as a Velocity salesperson at a price that he knew—thanks again to his access to VIS data—would meet Velocity's 20% profit margin. He thereby avoided triggering any "fail points" that would require managerial override. Velocity then sold the parts purchased from Echt to Dell. Hager employed this scheme for four years. During that time, Velocity purchased about $2.7 million in parts from Echt, and Hager made a profit of about $1.16 million from the fraud.

While the scheme was ongoing, Hager lied to Velocity to prevent being caught. He told other Velocity employees, for example, that Echt was run by two fictional Asian people named "Tim" and "Mary," who would only do business with him and did not want to communicate with anyone else. But Hager's cover was poor: his scheme was discovered in 2012 when a fellow employee ran an internet search on Echt and discovered that the company was listed under Hager's wife's name and that its registered address was Hager's home. Hager left Velocity soon thereafter.

Over the course of his Echt scheme, Hager filed three federal tax returns—for 2008, 2009, and 2010. Hager hired a tax preparer to help file the returns. The tax preparer testified at Hager's trial that Hager did not inform her of his income from Echt when she prepared his returns.

Hager was indicted on two counts of mail fraud, two counts of wire fraud, one count of engaging in monetary transactions in property derived from specified unlawful activity, and three counts of aiding and assisting the preparation of false tax returns. After an eight-day trial, the jury found Hager guilty on all counts. He was sentenced to 42 months' imprisonment for the fraud and money laundering counts and 36 months' imprisonment for the tax counts, all to run concurrently.

No. 16-51330

II.

The focus of Hager's appeal contests his mail and wire fraud charges. He raises two legal challenges: First, he argues that the applicable provisions of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, no longer protect confidential business information after the Supreme Court's opinion in *Skilling v. United States*, 561 U.S. 358 (2010). Second, he argues that, even if they still protect confidential business information, they only protect a narrow subset—namely, trade secrets as defined by state law. Relying on these arguments, Hager contends that the mail and wire fraud counts of the indictment failed to allege an offense, and, in the alternative, that the evidence was legally insufficient to support his conviction on those counts. But, as explained below, the charges are supported by binding Supreme Court precedent, *Carpenter v. United States*, 484 U.S. 19 (1987), and his conviction under these charges was adequately supported by record evidence.

This court "review[s] *de novo* questions of statutory interpretation, as well as whether an indictment sufficiently alleges the elements of an offense." *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (internal quotation marks and footnote omitted). Our review of the sufficiency of the evidence to support a criminal conviction is, by contrast, highly deferential. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To sufficiently allege a violation of the mail and wire fraud statutes, an indictment must charge the defendant with "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. §§ 1341, 1343. Hager's indictment alleged that he had defrauded Velocity "by depriving it of the exclusive use of

4

its confidential and proprietary business information"—specifically, information stored on the VIS regarding the company's relationship with Dell.

The wire and mail fraud charges here are directly supported by the Supreme Court's *Carpenter* opinion. In *Carpenter*, a business reporter for the Wall Street Journal was charged with mail and wire fraud under §§ 1341 and 1343 for divulging the contents of his regular column to stockbrokers before it was published. 484 U.S. at 22–23. Challenging the charge, he contended that the Journal's interest in the column was an "intangible right" not covered by the statute. *Id.* at 25 (quoting *McNally v. United States*, 483 U.S. 350 (1987), *superseded by* 18 U.S.C. § 1346).

Rejecting this argument, the Court found that the content of the defendant's column (prior to its publication) was the Journal's confidential business information, which "ha[d] long been recognized as property." *Id.* at 26 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001–04 (1984)). The information at issue was "acquired or compiled [by the Journal] in the course and conduct of its business," which gave the Journal "the exclusive right and benefit" to use or withhold the information as it chose. *Id.* (quoting 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, p. 260 (rev. ed. 1986)). Notably, the fact that the information had an "intangible nature" did not "make [the information] any less 'property' protected by" §§ 1341 and 1343. *Id.* at 25.

*Carpenter* applies directly here. Hager deprived Velocity of the exclusive use of its confidential business information when he misused the information regarding its clients and pricing for his personal enrichment. The information was stored, aggregated, and analyzed by the VIS, Velocity's proprietary, in-house software. The information is crucial for Velocity's business: It allows Velocity to track pricing trends both for suppliers and for buyers, and offers employees guidelines regarding proper pricing. It also allows Velocity to

maintain a specific profit margin, which is itself confidential. Moreover, Velocity has made its desire to keep this information private known to all of its employees, requiring them to sign numerous confidentiality agreements. The information qualifies as confidential business information creating a property right that is protected by the mail and wire fraud statutes. Hager's misuse of that information violated Velocity's "exclusive right and benefit" to it. *See Id.* at 26. In short, the mail and wire fraud counts of the indictment were proper. And, as the foregoing demonstrates, a rational trier of fact could have convicted him on those counts.

Hager's two legal challenges seek to block our application of *Carpenter*. First, Hager argues that *Carpenter*'s conclusion that "confidential business information" is protected under §§ 1341 and 1343 was severely curtailed by the Supreme Court in *Skilling*. This argument fails because the two cases concern entirely different interests. Whereas *Carpenter* sought to apply the mail and wire fraud statutes to property interests, the Court's opinion in *Skilling* referred to a separate interest: an "intangible right of honest services." *Skilling*, 561 U.S. at 368.

The distinction between property rights and the right to honest services was acknowledged by the Supreme Court in *McNally*. There, the Government prosecuted a private citizen under § 1341 who aided and abetted in a kickback scheme devised by government officials. *McNally*, 483 U.S. at 352–53. The Government argued that § 1341's prohibition against "any scheme or artifice to defraud, or for obtaining money or property" protected not only property interests, but other intangible rights such as the "right of citizenry to good government." *Id.* at 356. The Court found this to be an inappropriate extension of the statute. Instead, it interpreted "§ 1341 as limited in scope to the protection of property rights." *Id.* at 360.

No. 16-51330

Congress responded to *McNally* by enacting 18 U.S.C. § 1346. This section clarifies that "the term 'scheme or artifice to defraud' [in §§ 1341 and 1343] includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. *Cf. Skilling*, 561 U.S. at 403. In other words, Congress expanded the breadth of the mail and wire fraud statutes to protect "an intangible right of honest services" *in addition to* property rights.

*Skilling*, a case which concerned the Government's prosecution of an Enron executive for his "wide-ranging scheme to deceive the investing public," examined the scope of § 1346. *Id.* at 368–69. The Court found that the phrase "intangible right of honest services" would be unconstitutionally vague unless interpreted narrowly. *Id.* at 404–08. In order to avoid that result, it purposefully interpreted the provision to apply only to "bribery and kickback schemes." *Id.* at 412–14.

In light of this review, we see no basis for Hager's assertion that *Skilling* abrogates *Carpenter*'s holding. As a preliminary note, *Skilling* never mentions *Carpenter*, and we doubt the Supreme Court would overrule a prior holding without explicitly doing so. *Cf. Wilkerson v. Whitley*, 28 F.3d 498, 504 (5th Cir. 1994) (noting that "absent clear indications from the Supreme Court itself, lower courts should not lightly assume that a prior decision has been overruled *sub silentio* merely because its reasoning and result appear inconsistent with later cases" (internal citation omitted)). More importantly, *Skilling* and *Carpenter* involve distinct rights protected by the mail and wire fraud statutes: *Skilling*, the "intangible right of honest services," *Carpenter*, property rights— whether tangible or intangible. Indeed, the opinions are complementary insofar as they both establish the same, fundamental distinction between property rights and the right of honest services. *See Carpenter*, 484 U.S. at 359 (contrasting the intangible property interest at issue with the right to honest services, which the *McNally* Court had found "too ethereal in itself to fall

7

within the protection of the mail fraud statute" (citing *McNally*, 483 U.S. at 359 n.8)).

We conclude that *Carpenter*'s holding is unaffected by *Skilling* and, accordingly, that confidential business information remains a cognizable property right protected by §§ 1341 and 1343. We are not alone in this conclusion. *See, e.g., ReBrook v. United States*, 589 F. App'x 130, 131 (4th Cir. 2014), *affirming* No. 2:10-CV-01009, 2014 WL 555283, at *4–5 (S.D. W. Va. Feb. 11, 2014) (noting the distinction between intangible rights no longer covered by §§ 1341 and 1343 after *Skilling* and intangible property, which remains covered); *see United States v. Mahaffy*, 693 F.3d 113, 126 (2d Cir. 2012) (noting that "[a]fter *Skilling*, it is clear that to convict a defendant of honest services fraud, the government must prove paradigmatic kickbacks . . . or bribery").

We also reject Hager's argument in the alternative that, even if intangible property interests are protected under §§ 1341 and 1343, those interests are limited solely to trade secrets as defined by state law. Although state law is a valid source for defining the scope of property rights protected by federal laws, it is not the sole source. *See Ruckelshaus*, 467 U.S. at 1001 (noting that "property interests . . . . are created and their dimensions defined by existing rules or understandings that stem from an independent source *such as* state law" (emphasis added) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1972))); *see also Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 269 (5th Cir. 2012). Indeed, the Supreme Court in *Carpenter* relied on its own precedent, another federal statute, and a law treatise in concluding that confidential business information was a protected property interest. *Carpenter*, 484 U.S. at 26. There is a similar lack of authority to support Hager's assertion that §§ 1341 and 1343 protect only trade secrets.

No. 16-51330

*Cf. Mahaffy*, 693 F.3d at 135 ("Information may qualify as confidential under *Carpenter* even if it does not constitute a trade secret.").

In sum, neither of Hager's arguments precludes the straightforward application of *Carpenter* to this case. The charges under §§ 1341 and 1343 were proper, and his conviction based on sufficient evidence.[1]

III.

Hager raises additional challenges to the proceedings below. For the reasons provided, none provides a basis for reversal.

A. *Granting Immunity*

We reject Hager's argument that the district court should have granted his motion to order the Government to grant his wife immunity.[2] This court has repeatedly held that "district courts have no inherent power to grant immunity." *United States v. Brooks*, 681 F.3d 678, 711 (5th Cir. 2012) (alterations omitted) (quoting *United States v. Follin*, 979 F.2d 369, 374 (5th Cir. 1992)). "A district court may not grant immunity simply because a witness has essential exculpatory evidence unavailable from other sources. At most this Court has left open the possibility that immunity may be necessary to stem government abuse." *Id.* (internal citation omitted). The exercise of this authority requires "extraordinary circumstances." *United States v. Chagra*, 669 F.2d 241, 258 (5th Cir. 1982), *overruled on other grounds by Garrett v. United States*, 471 U.S. 773 (1985).

Since Hager did not preserve this argument below, we review only for plain error, *United States v. Comrie*, 842 F.3d 348, 350 (5th Cir. 2016). Here,

---

[1] Because we conclude that Hagar was properly convicted under the mail and wire fraud statutes, we need not address the Government's argument that he could still be convicted under the money laundering charge if he were improperly convicted on the fraud charges.

[2] Hager's wife instead invoked her Fifth Amendment privilege and declined to testify at trial.

the only evidence of government misconduct Hager submitted is the Government's response to his motion. Specifically, the Government stated that his wife might have participated in the wrongdoing, so she was "not the kind of witness that would be granted immunity." We discern no evidence of government abuse from this exchange, nor does it present the sort of extraordinary circumstances that might justify the exercise of the court's power to grant immunity.

B. *Evidentiary Rulings*

We also reject Hager's challenge to the district court's rulings blocking the admission of certain evidence. This court reviews a district court's evidentiary rulings for abuse of discretion, subject also to harmless error analysis. *United States v. Skipper*, 74 F.3d 608, 612 (5th Cir. 1996).

Hager sought to introduce evidence from a prior lawsuit between Velocity's owners and their employers prior to forming Velocity. The former employers sued Velocity's owners for having allegedly stolen proprietary information after leaving the company. Velocity's owners defended their actions in part by arguing the data they took were neither trade secrets nor otherwise proprietary. Hager sought to introduce this information by two means: having an expert witness discuss the prior lawsuit to compare it with the Government's present one, and submitting documents from the prior lawsuit. The court denied the admission of the former on relevance grounds, and the latter on hearsay grounds.

We discern no reversible error. The relevance of this evidence to the Government's criminal prosecution of Hager is, at best, tangential. There is little insight to be gleaned from a defensive position taken by Velocity's owners in a civil suit that concerns different data. But even if we were to find the court's evidentiary rulings erroneous, they were harmless. The district court expressly gave Hager permission to discuss the prior lawsuit as it related to

confidentiality on cross-examination of witnesses, and even offer the same documents as impeachment evidence at that time. But Hager failed to question any of Velocity's employees about the previous lawsuit. Failing to present this information to the jury may well have been a strategic blunder, but it was not due to an error by the district court.

### C. Motion to Sever Tax Fraud Counts

At trial, Hager moved to sever the tax fraud counts pursuant to Federal Rule of Criminal Procedure 14. The district court denied Hager's motion. We affirm.

"The denial of a motion to sever is reviewed under an 'exceedingly deferential' abuse of discretion standard." *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009) (quoting *United States v. Tarango*, 396 F.3d 666, 673 (5th Cir. 2005)). This court "will not reverse a conviction based upon denial of a motion to sever 'unless the defendant can demonstrate compelling prejudice against which the trial court was unable to afford protection, and that he was unable to obtain a fair trial.'" *Id.* at 356 (quoting *United States v. Massey*, 827 F.2d 995, 1004 (5th Cir. 1987)). The showing of prejudice must be "specific and compelling." *United States v. Ballis*, 28 F.3d 1399, 1408 (5th Cir. 1994).

Notably, this court has repeatedly held that severance "is not mandatory simply because a defendant indicates that he wishes to testify on some counts but not on others. . . . [S]everance for this reason, as for any other, remains in the sound discretion of the trial court." *Id.* (alteration and internal quotation marks omitted) (quoting *Alvarez v. Wainwright*, 607 F.2d 683, 685 (5th Cir. 1979)). "Consequently, a defendant seeking severance of charges because he wishes to testify as to some counts but not as to others has the burden of demonstrating 'that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other.'" *Id.* (quoting *United States v. Davis*, 752 F.2d 963, 972 (5th Cir. 1985)).

11

No. 16-51330

Hager argues that the court should have severed his tax counts because he wished to testify that that he had "specifically asked" his tax preparer about the proper way to report his income from Echt, and that she had instructed him "that it would be easier to file an amended return." The court's denial of his motion precluded him from testifying, however, because he did not want to expose himself to cross-examination relating to the details surrounding the mail and wire fraud counts. He feared this testimony would hurt his credibility.

Hager has not met his high burden. His reason for refraining from testifying—fear that cross-examination would elicit compromising evidence—is the same reason that many defendants refuse to testify: It is, after all, the nature of cross-examination to impeach witnesses and make them seem less credible. There is nothing extraordinary about this prejudice. Moreover, because his tax fraud charge and the mail and wire fraud charges are intertwined, severing the claims would not provide Hager effective relief from his concern. *Cf. United States v. McRae*, 702 F.3d 806, 823 (5th Cir. 2012) (severing claims where the two charges were "only tangentially relevant" to each other). After all, the Government alleged that his tax fraud was perpetuated to cover up the broader fraud. Accordingly, even if the tax counts had been severed, it is *still* likely that the same sort of questions would arise on cross-examination. The district court's denial of this motion to sever was not an abuse of its discretion.

IV.

For the foregoing reasons, we AFFIRM.