(Slip Opinion) OCTOBER TERM, 2019 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KELLY *v.* UNITED STATES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 18–1059. Argued January 14, 2020—Decided May 7, 2020

During former New Jersey Governor Chris Christie's 2013 reelection campaign, his Deputy Chief of Staff, Bridget Anne Kelly, avidly courted Democratic mayors for their endorsements, but Fort Lee's mayor refused to back the Governor's campaign. Determined to punish the mayor, Kelly, Port Authority Deputy Executive Director William Baroni, and another Port Authority official, David Wildstein, decided to reduce from three to one the number of lanes long reserved at the George Washington Bridge's toll plaza for Fort Lee's morning commuters. To disguise their efforts at political retribution, Wildstein devised a cover story: The lane realignment was for a traffic study. As part of that cover story, the defendants asked Port Authority traffic engineers to collect some numbers about the effect of the changes. At the suggestion of a Port Authority manager, they also agreed to pay an extra toll collector overtime so that Fort Lee's one remaining lane would not be shut down if the collector on duty needed a break. The lane realignment caused four days of gridlock in Fort Lee, and only ended when the Port Authority's Executive Director learned of the scheme. Baroni and Kelly were convicted in federal court of wire fraud, fraud on a federally funded program or entity (the Port Authority), and conspiracy to commit each of those crimes. The Third Circuit affirmed.

*Held*: Because the scheme here did not aim to obtain money or property, Baroni and Kelly could not have violated the federal-program fraud or wire fraud laws.

The federal wire fraud statute makes it a crime to effect (with the use of the wires) "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. §1343. Similarly, the federal-

program fraud statute bars "obtain[ing] by fraud" the "property" (including money) of a federally funded program or entity. §666(a)(1)(A). These statutes are "limited in scope to the protection of property rights," and do not authorize federal prosecutors to "set[ ] standards of disclosure and good government for local and state officials." *McNally* v. *United States,* 483 U. S. 350, 360. So under either provision, the Government had to show not only that Baroni and Kelly engaged in deception, but that an object of their fraud was money or property. *Cleveland* v. *United States,* 531 U. S. 12, 26.

The Government argues that the scheme had the object of obtaining the Port Authority's money or property in two ways. First, the Government claims that Baroni and Kelly sought to commandeer part of the Bridge itself by taking control of its physical lanes. Second, the Government asserts that the defendants aimed to deprive the Port Authority of the costs of compensating the traffic engineers and back-up toll collectors. For different reasons, neither of these theories can sustain the verdicts.

Baroni's and Kelly's realignment of the access lanes was an exercise of regulatory power—a reallocation of the lanes between different groups of drivers. This Court has already held that a scheme to alter such a regulatory choice is not one to take the government's property. *Id.,* at 23. And while a government's right to its employees' time and labor is a property interest, the prosecution must also show that it is an "object of the fraud." *Pasquantino* v. *United States,* 544 U. S. 349, 355. Here, the time and labor of the Port Authority employees were just the implementation costs of the defendants' scheme to reallocate the Bridge's lanes—an incidental (even if foreseen) byproduct of their regulatory object. Neither defendant sought to obtain the services that the employees provided. Pp. 6–13.

909 F. 3d 550, reversed and remanded.

KAGAN, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–1059

BRIDGET ANNE KELLY, PETITIONER *v.*
UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 7, 2020]

JUSTICE KAGAN delivered the opinion of the Court.

For four days in September 2013, traffic ground to a halt in Fort Lee, New Jersey. The cause was an unannounced realignment of 12 toll lanes leading to the George Washington Bridge, an entryway into Manhattan administered by the Port Authority of New York and New Jersey. For decades, three of those access lanes had been reserved during morning rush hour for commuters coming from the streets of Fort Lee. But on these four days—with predictable consequences—only a single lane was set aside. The public officials who ordered that change claimed they were reducing the number of dedicated lanes to conduct a traffic study. In fact, they did so for a political reason—to punish the mayor of Fort Lee for refusing to support the New Jersey Governor's reelection bid.

Exposure of their behavior led to the criminal convictions we review here. The Government charged the responsible officials under the federal statutes prohibiting wire fraud and fraud on a federally funded program or entity. See 18 U. S. C. §§1343, 666(a)(1)(A). Both those laws target fraudulent schemes for obtaining property. See §1343 (barring

fraudulent schemes "for obtaining money or property"); §666(a)(1)(A) (making it a crime to "obtain[] by fraud . . . property"). The jury convicted the defendants, and the lower courts upheld the verdicts.

The question presented is whether the defendants committed property fraud. The evidence the jury heard no doubt shows wrongdoing—deception, corruption, abuse of power. But the federal fraud statutes at issue do not criminalize all such conduct. Under settled precedent, the officials could violate those laws only if an object of their dishonesty was to obtain the Port Authority's money or property. The Government contends it was, because the officials sought both to "commandeer" the Bridge's access lanes and to divert the wage labor of the Port Authority employees used in that effort. Tr. of Oral Arg. 58. We disagree. The realignment of the toll lanes was an exercise of regulatory power—something this Court has already held fails to meet the statutes' property requirement. And the employees' labor was just the incidental cost of that regulation, rather than itself an object of the officials' scheme. We therefore reverse the convictions.

I

The setting of this case is the George Washington Bridge. Running between Fort Lee and Manhattan, it is the busiest motor-vehicle bridge in the world. Twelve lanes with tollbooths feed onto the Bridge's upper level from the Fort Lee side. Decades ago, the then-Governor of New Jersey committed to a set allocation of those lanes for the morning commute. And (save for the four days soon described) his plan has lasted to this day. Under the arrangement, nine of the lanes carry traffic coming from nearby highways. The three remaining lanes, designated by a long line of traffic cones laid down each morning, serve only cars coming from Fort Lee.

The case's cast of characters are public officials who

worked at or with the Port Authority and had political ties
to New Jersey's then-Governor Chris Christie. The Port
Authority is a bi-state agency that manages bridges, tun-
nels, airports, and other transportation facilities in New
York and New Jersey. At the time relevant here, William
Baroni was its Deputy Executive Director, an appointee of
Governor Christie and the highest ranking New Jersey of-
ficial in the agency. Together with the Executive Director
(a New York appointee), he oversaw "all aspects of the Port
Authority's business," including operation of the George
Washington Bridge. App. 21 (indictment). David Wildstein
(who became the Government's star witness) functioned as
Baroni's chief of staff. And Bridget Anne Kelly was a Dep-
uty Chief of Staff to Governor Christie with special respon-
sibility for managing his relations with local officials. She
often worked hand-in-hand with Baroni and Wildstein to
deploy the Port Authority's resources in ways that would
encourage mayors and other local figures to support the
Governor.

The fateful lane change arose out of one mayor's re-
sistance to such blandishments. In 2013, Governor Christie
was up for reelection, and he wanted to notch a large, bi-
partisan victory as he ramped up for a presidential cam-
paign. On his behalf, Kelly avidly courted Democratic
mayors for their endorsements—among them, Mark
Sokolich of Fort Lee. As a result, that town received some
valuable benefits from the Port Authority, including an ex-
pensive shuttle-bus service. But that summer, Mayor
Sokolich informed Kelly's office that he would not back the
Governor's campaign. A frustrated Kelly reached out to
Wildstein for ideas on how to respond. He suggested that
getting rid of the dedicated Fort Lee lanes on the Bridge's
toll plaza would cause rush-hour traffic to back up onto lo-
cal streets, leading to gridlock there. Kelly agreed to the
idea in an admirably concise e-mail: "Time for some traffic
problems in Fort Lee." App. 917 (trial exhibit). In a later

phone conversation, Kelly confirmed to Wildstein that she wanted to "creat[e] a traffic jam that would punish" Mayor Sokolich and "send him a message." *Id.*, at 254 (Wildstein testimony). And after Wildstein relayed those communications, Baroni gave the needed sign-off.

To complete the scheme, Wildstein then devised "a cover story"—that the lane change was part of a traffic study, intended to assess whether to retain the dedicated Fort Lee lanes in the future. *Id.,* at 264. Wildstein, Baroni, and Kelly all agreed to use that "public policy" justification when speaking with the media, local officials, and the Port Authority's own employees. *Id.,* at 265. And to give their story credibility, Wildstein in fact told the Port Authority's engineers to collect "some numbers on how[] far back the traffic was delayed." *Id.,* at 305. That inquiry bore little resemblance to the Port Authority's usual traffic studies. According to one engineer's trial testimony, the Port Authority never closes lanes to study traffic patterns, because "computer-generated model[ing]" can itself predict the effect of such actions. *Id.*, at 484 (testimony of Umang Patel); see *id.,* at 473–474 (similar testimony of Victor Chung). And the information that the Port Authority's engineers collected on this singular occasion was mostly "not useful" and "discarded." *Id.*, at 484–485 (Patel testimony). Nor did Wildstein or Baroni show any interest in the data. They never asked to review what the engineers had found; indeed, they learned of the results only weeks later, after a journalist filed a public-records request. So although the engineers spent valuable time assessing the lane change, their work was to no practical effect.

Baroni, Wildstein, and Kelly also agreed to incur another cost—for extra toll collectors—in pursuit of their object. Wildstein's initial thought was to eliminate all three dedicated lanes by not laying down any traffic cones, thus turning the whole toll plaza into a free-for-all. But the Port Authority's chief engineer told him that without the cones

"there would be a substantial risk of sideswipe crashes" involving cars coming into the area from different directions. *Id.*, at 284 (Wildstein testimony). So Wildstein went back to Baroni and Kelly and got their approval to keep one lane reserved for Fort Lee traffic. That solution, though, raised another complication. Ordinarily, if a toll collector on a Fort Lee lane has to take a break, he closes his booth, and drivers use one of the other two lanes. Under the one-lane plan, of course, that would be impossible. So the Bridge manager told Wildstein that to make the scheme work, "an extra toll collector" would always have to be "on call" to relieve the regular collector when he went on break. *Id.,* at 303. Once again, Wildstein took the news to Baroni and Kelly. Baroni thought it was "funny," remarking that "only at the Port Authority would [you] have to pay a toll collector to just sit there and wait." *Ibid.* Still, he and Kelly gave the okay.

The plan was now ready, and on September 9 it went into effect. Without advance notice and on the (traffic-heavy) first day of school, Port Authority employees placed traffic cones two lanes further to the right than usual, restricting cars from Fort Lee to a single lane. Almost immediately, the town's streets came to a standstill. According to the Fort Lee Chief of Police, the traffic rivaled that of 9/11, when the George Washington Bridge had shut down. School buses stood in place for hours. An ambulance struggled to reach the victim of a heart attack; police had trouble responding to a report of a missing child. Mayor Sokolich tried to reach Baroni, leaving a message that the call was about an "urgent matter of public safety." *Id.,* at 323. Yet Baroni failed to return that call or any other: He had agreed with Wildstein and Kelly that they should all maintain "radio silence." *Id.,* at 270. A text from the Mayor to Baroni about the locked-in school buses—also unanswered—went around the horn to Wildstein and Kelly. The last replied:

"Is it wrong that I am smiling?" *Id.*, at 990 (Kelly text message). The three merrily kept the lane realignment in place for another three days. It ended only when the Port Authority's Executive Director found out what had happened and reversed what he called their "abusive decision." *Id.*, at 963 (e-mail of Patrick Foye).

The fallout from the scheme was swift and severe. Baroni, Kelly, and Wildstein all lost their jobs. More to the point here, they all ran afoul of federal prosecutors. Wildstein pleaded guilty to conspiracy charges and agreed to cooperate with the Government. Baroni and Kelly went to trial on charges of wire fraud, fraud on a federally funded program or entity (the Port Authority), and conspiracy to commit each of those crimes. The jury found both of them guilty on all counts. The Court of Appeals for the Third Circuit affirmed, rejecting Baroni's and Kelly's claim that the evidence was insufficient to support their convictions. See *United States* v. *Baroni*, 909 F. 3d 550, 560–579 (2018). We granted certiorari. 588 U. S. ___ (2019).

## II

The Government in this case needed to prove *property* fraud. The federal wire fraud statute makes it a crime to effect (with use of the wires) "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. §1343. Construing that disjunctive language as a unitary whole, this Court has held that "the money-or-property requirement of the latter phrase" also limits the former. *McNally* v. *United States*, 483 U. S. 350, 358 (1987). The wire fraud statute thus prohibits only deceptive "schemes to deprive [the victim of] money or property." *Id.,* at 356. Similarly, the federal-program fraud statute bars "obtain[ing] by fraud" the "property" (including money) of a federally funded program or entity like the Port Authority. §666(a)(1)(A). So under either provision, the Government

had to show not only that Baroni and Kelly engaged in deception, but that an "object of the[ir] fraud [was] 'property.'" *Cleveland* v. *United States*, 531 U. S. 12, 26 (2000).[1]

That requirement, this Court has made clear, prevents these statutes from criminalizing all acts of dishonesty by state and local officials. Some decades ago, courts of appeals often construed the federal fraud laws to "proscribe[] schemes to defraud citizens of their intangible rights to honest and impartial government." *McNally*, 483 U. S., at 355. This Court declined to go along. The fraud statutes, we held in *McNally*, were "limited in scope to the protection of property rights." *Id.,* at 360. They did not authorize federal prosecutors to "set[] standards of disclosure and good government for local and state officials." *Ibid.* Congress responded to that decision by enacting a law barring fraudulent schemes "to deprive another of the intangible right of honest services"—regardless of whether the scheme sought to divest the victim of any property. §1346. But the vagueness of that language led this Court to adopt "a limiting construction," confining the statute to schemes involving bribes or kickbacks. *Skilling* v. *United States*, 561 U. S. 358, 405, 410 (2010). We specifically rejected a proposal to construe the statute as encompassing "undisclosed self-dealing by a public official," even when he hid financial interests. *Id.,* at 409. The upshot is that federal fraud law leaves much public corruption to the States (or their electorates) to rectify. Cf. N. J. Stat. Ann. §2C:30–2 (West 2016) (prohibiting the unauthorized exercise of official functions). Save for bribes or kickbacks (not at issue here), a state or local official's fraudulent schemes violate that law only when, again, they are "for obtaining money or property." 18 U. S. C. §1343; see §666(a)(1)(A) (similar).

————

[1] The conspiracy verdicts raise no separate issue. None of the parties doubts that those convictions stand or fall with the substantive offenses. If there was property fraud here, there was also conspiracy to commit it. But if not, not.

The Government acknowledges this much, but thinks Baroni's and Kelly's convictions remain valid. According to the Government's theory of the case, Baroni and Kelly "used a lie about a fictional traffic study" to achieve their goal of reallocating the Bridge's toll lanes. Brief for United States 43. The Government accepts that the lie itself—*i.e.,* that the lane change was part of a traffic study, rather than political payback—could not get the prosecution all the way home. See *id.,* at 43–44. As the Government recognizes, the deceit must also have had the "object" of obtaining the Port Authority's money or property. *Id.,* at 44. The scheme met that requirement, the Government argues, in two ways. First, the Government claims that Baroni and Kelly sought to "commandeer[]" part of the Bridge itself—to "take control" of its "physical lanes." Tr. of Oral Arg. 58–59. Second, the Government asserts that the two defendants aimed to deprive the Port Authority of the costs of compensating the traffic engineers and back-up toll collectors who performed work relating to the lane realignment. On either theory, the Government insists, Baroni's and Kelly's scheme targeted "a 'species of valuable right [or] interest' that constitutes 'property' under the fraud statutes." Brief for United States 22 (quoting *Pasquantino* v. *United States*, 544 U. S. 349, 356 (2005)).

We cannot agree. As we explain below, the Government could not have proved—on either of its theories, though for different reasons—that Baroni's and Kelly's scheme was "directed at the [Port Authority's] property." Brief for United States 44. Baroni and Kelly indeed "plotted to reduce [Fort Lee's] lanes." *Id.,* at 34. But that realignment was a quintessential exercise of regulatory power. And this Court has already held that a scheme to alter such a regulatory choice is not one to appropriate the government's property. See *Cleveland*, 531 U. S., at 23. By contrast, a scheme to usurp a public employee's paid time is one to take the government's property. But Baroni's and Kelly's plan

never had that as an object. The use of Port Authority employees was incidental to—the mere cost of implementing— the sought-after regulation of the Bridge's toll lanes.

Start with this Court's decision in *Cleveland*, which reversed another set of federal fraud convictions based on the distinction between property and regulatory power. The defendant there had engaged in a deceptive scheme to influence, to his own benefit, Louisiana's issuance of gaming licenses. The Government argued that his fraud aimed to deprive the State of property by altering its licensing decisions. This Court rejected the claim. The State's "intangible rights of allocation, exclusion, and control"—its prerogatives over who should get a benefit and who should not— do "not create a property interest." *Ibid.* Rather, the Court stated, those rights "amount to no more and no less than" the State's "sovereign power to regulate." *Ibid.*; see *id.,* at 20 ("[T]he State's core concern" in allocating gaming licenses "is *regulatory*"). Or said another way: The defendant's fraud "implicate[d] the Government's role as sovereign" wielding "traditional police powers"—not its role "as property holder." *Id.,* at 23–24. And so his conduct, however deceitful, was not property fraud.

The same is true of the lane realignment. Through that action, Baroni and Kelly changed the traffic flow onto the George Washington Bridge's tollbooth plaza. Contrary to the Government's view, the two defendants did not "commandeer" the Bridge's access lanes (supposing that word bears its normal meaning). They (of course) did not walk away with the lanes; nor did they take the lanes from the Government by converting them to a non-public use. Rather, Baroni and Kelly regulated use of the lanes, as officials responsible for roadways so often do—allocating lanes as between different groups of drivers. To borrow *Cleveland*'s words, Baroni and Kelly exercised the regulatory rights of "allocation, exclusion, and control"—deciding that

drivers from Fort Lee should get two fewer lanes while drivers from nearby highways should get two more. They did so, according to all the Government's evidence, for bad reasons; and they did so by resorting to lies. But still, *what* they did was alter a regulatory decision about the toll plaza's use—in effect, about which drivers had a "license" to use which lanes. And under *Cleveland*, that run-of-the-mine exercise of regulatory power cannot count as the taking of property.

A government's right to its employees' time and labor, by contrast, can undergird a property fraud prosecution. Suppose that a mayor uses deception to get "on-the-clock city workers" to renovate his daughter's new home. *United States* v. *Pabey*, 664 F. 3d 1084, 1089 (CA7 2011). Or imagine that a city parks commissioner induces his employees into doing gardening work for political contributors. See *United States* v. *Delano*, 55 F. 3d 720, 723 (CA2 1995). As both defendants agree, the cost of those employees' services would qualify as an economic loss to a city, sufficient to meet the federal fraud statutes' property requirement. See Brief for Respondent Baroni 27; Tr. of Oral Arg. 16. No less than if the official took cash out of the city's bank account would he have deprived the city of a "valuable entitlement." *Pasquantino*, 544 U. S., at 357.

But that property must play more than some bit part in a scheme: It must be an "object of the fraud." *Id.*, at 355; see Brief for United States 44; *supra,* at 6–7. Or put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme.[2] In the home-and-garden examples cited above,

---

[2] Without that rule, as Judge Easterbrook has elaborated, even a practical joke could be a federal felony. See *United States* v. *Walters*, 997 F. 2d 1219, 1224 (CA7 1993). His example goes: "A [e-mails] B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation," thus expending the cost of gasoline. *Ibid.* "But there is no party; the address is a vacant lot; B is the butt of

that constraint raised no problem: The entire point of the fraudsters' plans was to obtain the employees' services. But now consider the difficulty if the prosecution in *Cleveland* had raised a similar employee-labor argument. As the Government noted at oral argument here, the fraud on Louisiana's licensing system doubtless imposed costs calculable in employee time: If nothing else, some state worker had to process each of the fraudster's falsified applications. But still, the Government acknowledged, those costs were "[i]ncidental." Tr. of Oral Arg. 63. The object of the scheme was never to get the employees' labor: It was to get gaming licenses. So the labor costs could not sustain the conviction for property fraud. See *id.,* at 62–63.

This case is no different. The time and labor of Port Authority employees were just the implementation costs of the defendants' scheme to reallocate the Bridge's access lanes. Or said another way, the labor costs were an incidental (even if foreseen) byproduct of Baroni's and Kelly's regulatory object. Neither defendant sought to obtain the services that the employees provided. The back-up toll collectors— whom Baroni joked would just "sit there and wait"—did nothing he or Kelly thought useful. App. 303; see *supra,* at 5. Indeed, those workers came onto the scene only because the Port Authority's chief engineer managed to restore one of Fort Lee's lanes to reduce the risk of traffic accidents. See *supra,* at 5. In the defendants' original plan, which scrapped all reserved lanes, there was no reason for extra toll collectors. And similarly, Baroni and Kelly did not hope to obtain the data that the traffic engineers spent their time collecting. By the Government's own account, the traffic study the defendants used for a cover story was a "sham," and they never asked to see its results. Brief for United

_____

a joke." *Ibid.* Wire fraud? No. And for the reason Judge Easterbrook gave: "[T]he victim's loss must be an objective of the [deceitful] scheme rather than a byproduct of it." *Id.,* at 1226.

States 4, 32; see *supra,* at 5.  Maybe, as the Government contends, all of this work was "needed" to realize the final plan—"to accomplish what [Baroni and Kelly] were trying to do with the [B]ridge."  Tr. of Oral Arg. 60.  Even if so, it would make no difference.  Every regulatory decision (think again of *Cleveland*, see *supra,* at 11) requires the use of some employee labor.  But that does not mean every scheme to alter a regulation has that labor as its object.  Baroni's and Kelly's plan aimed to impede access from Fort Lee to the George Washington Bridge.  The cost of the employee hours spent on implementing that plan was its incidental byproduct.

To rule otherwise would undercut this Court's oft-repeated instruction: Federal prosecutors may not use property fraud statutes to "set[] standards of disclosure and good government for local and state officials."  *McNally*, 483 U. S., at 360; see *supra,* at 7.  Much of governance involves (as it did here) regulatory choice.  If U. S. Attorneys could prosecute as property fraud every lie a state or local official tells in making such a decision, the result would be—as *Cleveland* recognized—"a sweeping expansion of federal criminal jurisdiction."  531 U. S., at 24.  And if those prosecutors could end-run *Cleveland* just by pointing to the regulation's incidental costs, the same ballooning of federal power would follow.  In effect, the Federal Government could use the criminal law to enforce (its view of) integrity in broad swaths of state and local policymaking.  The property fraud statutes do not countenance that outcome.  They do not "proscribe[] schemes to defraud citizens of their intangible rights to honest and impartial government."  *McNally*, 483 U. S., at 355; see *supra,* at 7.  They bar only schemes for obtaining property.

## III

As Kelly's own lawyer acknowledged, this case involves an "abuse of power."  Tr. of Oral Arg. 19.  For no reason

other than political payback, Baroni and Kelly used deception to reduce Fort Lee's access lanes to the George Washington Bridge—and thereby jeopardized the safety of the town's residents. But not every corrupt act by state or local officials is a federal crime. Because the scheme here did not aim to obtain money or property, Baroni and Kelly could not have violated the federal-program fraud or wire fraud laws. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*