# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-50257

United States Court of Appeals
Fifth Circuit

**FILED**
August 14, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

WILLIAM JAMES JONAS, III,

      Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:16-CR-135-1

Before KING, GRAVES, and OLDHAM, Circuit Judges.

PER CURIAM:*

    William James Jonas, III, was the city attorney and city manager for Crystal City, Texas. During Jonas's tenure, Crystal City issued certificates of obligation—a kind of municipal bond—and certified that the proceeds would be kept separate from the city's other funds and would be used to pay for energy-saving infrastructure improvements. Notwithstanding that certification, Jonas directed city employees to place the proceeds into Crystal

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-50257

City's general fund and to use those proceeds for other purposes, including paying his own salary. A jury found Jonas guilty of four wire-fraud offenses, and the district court sentenced him to 420 months of imprisonment. On appeal, Jonas challenges both his wire-fraud convictions and his sentence. For the following reasons, we AFFIRM the judgment of the district court.

## I.

In 2013, Crystal City began discussions with Siemens Industry, Inc. regarding potential energy-saving infrastructure upgrades. Even though these upgrades were designed to pay for themselves over time, Siemens knew that Crystal City would have to borrow money to be able to afford the upfront costs. Siemens therefore approached Crews and Associates, an Arkansas-based investment bank that Siemens had worked with previously, about Crystal City's financing options. Crews declined to provide financing for the contemplated infrastructure improvements, however.

Notwithstanding Crews's decision, Siemens and Crystal City executed a contract in May 2014. Siemens agreed to make the infrastructure improvements and guaranteed that Crystal City would save approximately $200,000 per year for fifteen years, subject to fluctuations in energy prices.[1] In return, the city agreed to deposit the full contract price—$2,124,389—in an escrow account within ninety days and to pay that money to Siemens in a series of installments as work on the infrastructure upgrades progressed.

Because Crystal City did not obtain financing, it was not able to meet its contractual obligation to fund an escrow account within ninety days. Siemens and the city therefore modified their contract such that an escrow account did not need to be funded until ninety days after Crystal City's city council

---

[1] The contract guaranteed that the infrastructure improvements would save Crystal City a certain amount of energy and then used a schedule of utility rates, not Crystal City's actual costs, to evaluate Crystal City's cost savings.

No. 18-50257

approved a financing arrangement. The addendum modifying the contract was executed by Siemens and Jonas—acting on behalf of Crystal City—in September 2014.

While it was negotiating that addendum, Siemens approached Crews a second time regarding financing for Crystal City. After reviewing additional information about the city's finances, Crews decided that it would be willing to arrange financing if and only if Crystal City was willing to fund its infrastructure improvements by issuing certificates of obligation secured by its property-tax revenue. Given the city's financial condition, Crews did not believe that more-commonly-used lending facilities—which would be subject to annual appropriations by Crystal City and secured only by the equipment installed by Siemens—were a viable alternative.

Crystal City agreed to finance the infrastructure improvements via a public offering of certificates of obligation, but doing so was no simple matter. Crystal City hired a law firm to serve as bond counsel, and that firm—with input from Crews and Jonas—drafted the required documents. These documents included: (i) an official statement describing the certificates and how they would be used; (ii) an ordinance authorizing the issuance of the certificates of obligation and approving the official statement; (iii) a contract retaining Crews as the underwriter for the public offering of the certificates and indicating that Crews would purchase the certificates from Crystal City for resale to investors; and (iv) a federal tax certification assuring investors that all the conditions required for the certificates to be exempt from federal income taxation had been met. On December 9, 2014, the city council enacted the ordinance, approved the official statement, and agreed to the contract with Crews. Three weeks later, on December 30, Jonas executed the federal tax certificate, the certificates of obligation were issued, and the city received the proceeds of the certificates of obligation.

No. 18-50257

The ordinance, the official statement, the contract with Crews, and the federal tax certificate all represented that the proceeds of the certificates of obligation would be kept in a separate fund, not the city's general fund. Those documents also represented that the proceeds would be used to pay for the infrastructure improvements and the costs of the public offering, as opposed to other city business. In fact, the federal tax certificate expressly provided that the city would not use the proceeds as working capital.

As it turns out, these representations were false. The certificate proceeds were immediately placed—at Jonas's direction and contrary to the city's usual practice—in Crystal City's general fund instead of in a separate account. And over the next five months, Crystal City spent substantially all of the proceeds,[2] but Siemens received only $1,210,926.05 during that period. The rest of the proceeds were used for to pay for expenses that were not related to the infrastructure improvements, such as Jonas's salary. Even with the certificate proceeds, Crystal City could not afford to pay its bills as they became due, and Jonas decided which bills would be paid and when those payments would occur.

Although Siemens was not paid on time or in full, it completed the infrastructure upgrades in Crystal City by October 2015. In total, Crystal City

---

[2] Because the certificate proceeds were commingled with Crystal City's other funds, it is impossible to say precisely when the proceeds were spent. *See, e.g.*, *Hawes v. Stephens*, 964 F.3d 412, 417 (5th Cir. 2020) ("Because Mr. Hawes's VA benefits were commingled with . . . sizeable deposits by a private individual, it is impossible to know whether the medical co-payment was charged against funds that originated from the Department of the Treasury."). Bank records show, however, that there was only $7,936.42 in the general fund as of May 6, 2015, so the rest of the certificate proceeds must have been spent on or before that date. *See, e.g.*, *United States v. Miller*, 911 F.3d 229, 234 (4th Cir. 2018) ("The [lowest-intermediate-balance rule] provides that where the balance of an account into which tainted proceeds are deposited subsequently dips below the amount of those tainted proceeds, the only tainted funds thereafter traceable to the account are funds equal to that lowest account balance. This is true even if the account balance later grows through the deposit of legitimate funds."); *see also Swor v. Bartley Tex. Builders Hardware Inc. (In re Swor)*, 347 F. App'x 113, 117 (5th Cir. 2009) (applying the lowest-intermediate-balance rule).

No. 18-50257

paid Siemens $1,404,340.21. This amount allowed Siemens to recoup its costs, but it was paid about $700,000 less than the contract price.

## II.

On February 3, 2016, Jonas was indicted as part of a federal investigation into public corruption in Crystal City. Among other things, Jonas was charged with four counts of wire fraud under 18 U.S.C. § 1343, which were based on the misapplication of the certificate proceeds.[3] The indictment identified three other schemes involving public corruption in Crystal City: (i) Jonas solicited bribes from a contractor named Daniel Hejl and facilitated bribes from Hejl to three corrupt members of the city council in exchange for lucrative contracts with the city; (ii) Jonas asked a lawyer to represent another contractor in its dealings with the city and to pay a portion of that lawyer's fee to Jonas as a kickback; and (iii) as part of a corrupt arrangement between Crystal City's mayor, Ricardo Lopez, and local businessman Ngoc Tri Nguyen, Jonas directed city officials to shut down one of Nguyen's competitors and to waive some of Nguyen's taxes. *See generally United States v. Lopez*, No. 18-50465, 2020 WL 3524552 (5th Cir. June 29, 2020). With respect to these three schemes, Jonas and Lopez were charged with federal-programs bribery under 18 U.S.C. § 666, honest-services wire fraud under 18 U.S.C. §§1343, 1346, and conspiracy to commit those offenses under 18 U.S.C. §§ 371, 1349.

The district court held a six-day trial regarding the charges against Jonas and Lopez. Neither defendant asked the district court to sever the trial.

---

[3] Three of the wire-fraud counts were based on emails that Jonas sent to Crews in December 2014; these emails transmitted executed copies of documents associated with the certificates, such as the ordinance and Crews's contract with the city. The fourth count was based on the wire transfer sending the certificate proceeds to Crystal City. Each use of wire communications was charged as a separate offense, because "[i]t is not the scheme to defraud but the use of the mails or wires that constitutes mail or wire fraud." *United States v. St. Gelais*, 952 F.2d 90, 97 (5th Cir. 1992).

5

No. 18-50257

At the close of the United States's case, Jonas moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The district court denied that motion, and the jury found Jonas guilty on all charges.

After the jury returned its verdict, Jonas's court-appointed attorney asked—at Jonas's request—the district court for leave to withdraw from the case. The district court held a hearing on September 26, 2017. At the hearing, Jonas explained that he wanted to make certain motions, such as a motion for a new trial based on alleged prosecutorial misconduct, that his attorney was not willing to file. The district court indicated that it was not willing to appoint a new lawyer to represent Jonas during sentencing, but it would allow him to proceed pro se. After the district court set out these options, Jonas's attorney indicated that he had already discussed the dangers of proceeding pro se with his client. Nevertheless, Jonas decided that he would rather represent himself at sentencing.

Six months after this hearing, the United States Probation Office completed its Presentence Investigation Report (PSR). Pursuant to the United States Sentencing Guidelines, the PSR treated all of Jonas's convictions as a single group of closely related counts. *See* U.S. Sentencing Guidelines Manual § 3D1.2 cmt. n.6 (U.S. Sentencing Comm'n 2016) (U.S.S.G.) (stating, as an example, that "five counts of mail fraud and ten counts of wire fraud" should be grouped together even if they "arise from various schemes"). The PSR calculated Jonas's offense level to be 40, which included a 16-level enhancement for causing a loss of more than $1,500,000 but less than $3,500,000. This enhancement was based on "an intended loss to Crystal City of $2,172,102.51," the amount of certificate proceeds received by the city, because the "misallocation of these funds and Crystal City's late payments to Siemens . . . (from the outset) show that Jonas was unconcerned with paying

6

the contracted amounts and rather was interested in using the borrowed money to fund (amongst other things) his salary and expenses." Given Jonas's offense level and criminal-history category, the PSR concluded that Jonas's sentencing range was 292-365 months.

At the district court's sentencing hearing on May 16, 2018, Jonas objected to the PSR's 16-level enhancement based on intended loss. Jonas argued that there was no intended loss, because—per Jonas—Crystal City could have paid Siemens out of its tax revenues notwithstanding the misappropriation of the certificate proceeds. Jonas further argued that there was no intended loss to Siemens, because he intended to pay Siemens eventually, as evidenced by the payments actually made to Siemens. The district court overruled Jonas's objection, finding that Jonas did not initially intend to pay Siemens and that the intended loss was therefore the full contract price owed to Siemens. Accordingly, the district court concluded that the PSR correctly calculated Jonas's sentencing range under the Guidelines.

After hearing a victim-impact statement from the woman who took over as Crystal City's city manager following Jonas's arrest and indictment, the district court decided that a sentence within Jonas's sentencing range was not adequate "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Consequently, the district court imposed a 420-month sentence.[4] Jonas filed a timely notice of appeal.

---

[4] Because the statutory maximum sentence for a wire-fraud offense is 20 years, 18 U.S.C. § 1343, the district court had to impose consecutive sentences in order to impose a total sentence of 420 months, *see* U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.").

No. 18-50257

## III.

Jonas, who is represented by appointed counsel on appeal, argues that the district court violated Rule 8(b) of the Federal Rules of Criminal Procedure by trying the wire-fraud charges against him alongside the federal-programs-bribery, honest-services-wire-fraud, and conspiracy charges against himself and Lopez. According to Jonas, these two groups of charges were not sufficiently related to be charged in a single indictment. Jonas did not present his Rule 8(b) argument to the district court or otherwise move for severance, so we review—at most—for plain error. *See United States v. Mann*, 161 F.3d 840, 862 (5th Cir. 1998).[5] To qualify as plain, "the legal error must be clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

For the purposes of Rule 8, whether joinder is proper normally depends on the allegations in the indictment, which are taken as true. *United States v. McRae*, 702 F.3d 806, 820 (5th Cir. 2012); *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir. 1994). A single indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). We construe the terms of Rule 8 broadly in favor of joinder. *United States v. Butler*, 429 F.3d 140, 146 (5th Cir. 2005).

Whether the wire-fraud charges against Jonas were part of the same series of acts or transactions as the other charges against Jonas and Lopez is at least subject to reasonable dispute. In connection with the wire-fraud charges, the indictment alleges that the certificate proceeds were used to "pay

---

[5] *Mann* states that, in cases where defendants "have failed to show any cause for failing to move for severance prior to trial," we have held that "we need not even address the merits of their [Rule 8(b)] argument." 161 F.3d at 862. *Mann* also states, however, that in other cases "we have limited review to plain error review in such circumstances." *Id.*

No. 18-50257

certain favored contractors, including [Hejl]." Other portions of the indictment indicate that Hejl enjoyed his favored status—and therefore received a portion of the certificate proceeds—because he paid bribes to Jonas and others. Read together, these allegations indicate that Jonas's wire-fraud offenses were used to fund other offenses charged in the indictment, so the district court did not plainly err by failing to make a sua sponte severance.

## IV.

Jonas also argues that there was insufficient evidence introduced at trial to support the jury's verdict regarding the wire-fraud offenses. When considering a properly preserved challenge to the sufficiency of the evidence, we review the district court's decision de novo, but we afford considerable deference to the jury's verdict. *United States v. Curtis*, 635 F.3d 704, 717-18 (5th Cir. 2011). We view the evidence in the light most favorable to the verdict, and we will affirm if any reasonable trier of fact could have found every element of the offense beyond a reasonable doubt. *Id.* Applying this standard, we conclude that the district court correctly rejected Jonas's challenge to the sufficiency of the evidence.

## A.

Federal law "makes it a crime to effect (with use of the wires) 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (quoting 18 U.S.C. § 1343). While the wire-fraud statute refers to two categories of schemes, i.e., schemes to defraud and schemes to obtain money or property, the Supreme Court has held that those categories are coextensive. *McNally v. United States*, 483 U.S. 350, 359 (1987).[6]

---

[6] Congress responded to this holding by enacting 28 U.S.C. § 1346, which states that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." To avoid constitutional difficulties, the Supreme

No. 18-50257

Consequently, in a wire-fraud prosecution, "the government must prove: (1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016).

The scheme-to-defraud element means that the wire-fraud statute "prohibits only deceptive schemes to deprive the victim of money or property." *Kelly*, 140 S. Ct. at 1571 (cleaned up). The deception does not need to be targeted at the victim, so a scheme to defraud may involve deceiving one person to deprive someone else of money or property. *United States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010). And a scheme to defraud does not need to involve a personal benefit for the perpetrator. *United States v. Blaszczak*, 947 F.3d 19, 35-36 (2d Cir. 2019); *see also Kelly*, 140 S. Ct. at 1573 (a deceptive scheme by a mayor to get on-the-clock city workers to renovate his daughter's house could "undergird a property fraud prosecution"); *United States v. Baker*, 923 F.3d 390, 404 (5th Cir. 2019) ("Section 1343 does not require an intent to obtain property directly from a victim."), *cert. denied*, 140 S. Ct. 2565 (2020). That said, "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Kelly*, 140 S. Ct. at 1573.

Additionally, the statutory phrase "scheme or artifice to defraud" contains an implicit materiality requirement. *Neder v. United States*, 527 U.S. 1, 25 (1999) ("We hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). A false statement is material if it has a natural tendency to influence or is capable of influencing the decisionmaker to which it is addressed. *Id.* at 16. The natural-tendency test is "an objective one focused on whether the statement is of a type capable

---

Court has limited this provision so that it criminalizes only bribes and kickbacks. *Skilling v. United States*, 561 U.S. 358, 408-09 (2010). Since Jonas's wire-fraud convictions are not based on bribes or kickbacks, § 1346 does not affect our analysis.

of influencing a reasonable decision maker," not on the particular circumstances in which a statement is made. *United States v. Evans*, 892 F.3d 692, 712 (5th Cir. 2018) (cleaned up); *see also United States v. Abrahem*, 678 F.3d 370, 376 (5th Cir. 2012) (concluding that "delivery of the statement in a manner not likely to persuade does not affect the materiality of the statement"). *But see United States v. Davis*, 226 F.3d 346, 358-59 (5th Cir. 2000) (rejecting the argument that "a misrepresentation is only material if a reasonable person would rely on it" because "a statement could indeed be material, even though only an unreasonable person would rely on it, if the maker knew or had reason to know his victim was likely so to rely").

## B.

Jonas contends that there was no evidence that a scheme to defraud existed, but we reject that contention. The official statement, the federal tax certificate, and other formal documents associated with the public offering of the certificates promised that the proceeds would be kept separate from Crystal City's other funds and would be used to pay for infrastructure improvements. One of Jonas's subordinates, acting pursuant to his instructions, broke those promises almost as soon as they were made. A reasonable jury could therefore infer that Jonas knew that the promises were false all along but used them to obtain money from the investors anyway—in other words, that Jonas engaged in a scheme to defraud. *See Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1007 (7th Cir. 2004) ("Fraud requires much more than simply not following through on contractual or other promises. It requires a showing of deception at the time the promise is made."); *see also United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) (holding, in a civil action premised on an alleged violation of § 1343, that "where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent

intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim").

We likewise reject Jonas's contention that there was no evidence before the jury indicating that the false promises about where the certificate proceeds would be kept and how they would be spent were material. The jury heard testimony from a Crews representative indicating that the investment bank would not have been willing to participate in the public offering if it had known that Crystal City's promises about the certificate proceeds were false. Indeed, if Jonas had not signed the federal tax certificate—or if that document had accurately described how the certificate proceeds would be used—the public offering would not have occurred, and Crystal City would not have obtained the certificate proceeds. We therefore conclude that the jury could have reasonably concluded that the false promises contained in the federal tax certificate were material, so Jonas's wire-fraud convictions were supported by sufficient evidence.

## V.

In his third point of error, Jonas contends that the district court deprived him of his right to counsel at sentencing by failing to appoint substitute counsel and by allowing him to proceed pro se. We review Sixth Amendment claims de novo. *United States v. Romans*, 823 F.3d 299, 312 (5th Cir. 2016). "Absent a Sixth Amendment violation, a court's refusal to appoint substitute counsel is reviewed for an abuse of discretion." *Id.* If a defendant waives his or her right to counsel and elects to proceed pro se, we review de novo whether that decision was knowing and intelligent. *United States v. Tate*, 535 F. App'x 359, 361 (5th Cir. 2013).

### A.

The district court did not violate the Sixth Amendment by refusing to appoint substitute counsel for Jonas. "An indigent defendant who cannot afford

to retain an attorney has an absolute right to have counsel appointed by the court." *Romans*, 823 F.3d at 312. But a defendant is not entitled to appointed counsel of his or her choice, *United States v. Fields*, 483 F.3d 313, 350 (5th Cir. 2007), so district courts are constitutionally required to appoint substitute counsel only upon a showing of "good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict," *Romans*, 823 F.3d at 312 (quoting *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973)).

The mere fact that a defendant is not satisfied with an attorney's performance does not qualify as good cause. *United States v. Sarfraz*, 683 F. App'x 268, 269 (5th Cir. 2017). Similarly, differences of opinion between appointed counsel and a defendant regarding strategic choices do not constitute good cause for the appointment of substitute counsel. *See United States v. Moore*, 706 F.2d 538, 540 (5th Cir. 1983) ("A defendant is entitled to appointment of an attorney with whom he can communicate reasonably, but has no right to an attorney who will docilely do as he is told.").

Jonas testified that he wanted substitute counsel because his court-appointed attorney would not file certain motions that Jonas requested. Jonas also testified that he was not satisfied with his lawyer's performance at trial and in connection with an unsuccessful motion for release on bond pending sentencing. Additionally, Jonas's lawyer stated: "It now puts me in an extremely difficult situation to represent Mr. Jonas when I know he's, in fact, very unsatisfied with my representation of him."

These issues do not amount to good cause for appointment of substitute counsel. Far from evidencing a complete breakdown in communication or an irreconcilable conflict, the record indicates that Jonas and his attorney maintained a functional working relationship. For example, Jonas's attorney told the district court that he had explained to Jonas the dangers of proceeding

pro se at sentencing. Since there was not good cause for appointing substitute counsel, the district court's failure to do so did not violate the Sixth Amendment.

## B.

Jonas argues, in the alternative, that even if the district court did not violate the Sixth Amendment by failing to appoint substitute counsel, it abused its discretion by failing to do so. The district court denied substitute counsel to Jonas because it was concerned that appointment of new counsel would unduly delay Jonas's sentencing and because it believed that Jonas's request was an attempt "to play games with the system." Jonas has not established that the district court's consideration of these factors involved "an error of law or a clearly erroneous assessment of the evidence." *Romans*, 823 F.3d at 312 (quoting *United States v. Teuschler*, 689 F.3d 397, 399 (5th Cir. 2012)). Consequently, we conclude that no abuse of discretion took place.

## C.

Jonas validly waived his right to counsel when he elected to proceed pro se at sentencing. Because there was not good cause to appoint substitute counsel for Jonas, this case does not involve "the constitutionally repugnant choice between representation by disqualified court-appointed counsel and self-representation." *Dunn v. Johnson*, 162 F.3d 302, 307 (5th Cir. 1998). It follows that the district court's decision to deny substitute counsel to Jonas did not render his subsequent "waiver of the right to counsel involuntary." *Id.* While Jonas's decision to represent himself at sentencing appears unwise in retrospect, the district court adequately warned Jonas about the danger of representing himself, and Jonas confirmed that he was knowingly and intelligently waiving his right to court-appointed counsel. Given Jonas's education and experience practicing law, we are willing to take him at his word

No. 18-50257

and therefore conclude that Jonas knowingly and intelligently waived his right to counsel.

## VI.

As his next point of error, Jonas asserts that the district court erred when it calculated his Guidelines sentencing range by incorrectly quantifying the loss associated with his offenses. "Under the Sentencing Guidelines, the offense level for offenses involving fraud is increased based on the amount of the loss inflicted by the defendant." *United States v. Harris*, 597 F.3d 242, 249 (5th Cir. 2010). We review the district court's finding regarding the amount of loss for clear error, but we review the district court's method for determining that amount de novo. *United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016).

For the purposes of the Guidelines, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). Intended loss, on the other hand, "means the pecuniary harm that the defendant purposely sought to inflict." *Id.* cmt. n.3(A)(ii). Accordingly, intended loss "does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated." *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011); *see also* Amendment 792 to the United States Sentencing Guidelines (adopting the view articulated by then-Judge Gorsuch in *Manatau*). Put another way, "our case law requires the government [to] prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level." *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003).

The district court found that Jonas's intended loss was greater than $1,500,000 and less than $3,500,000, so it applied a 16-level enhancement to the offense level. *See* U.S.S.G. § 2B1.1(b)(1)(I). The district court found that,

No. 18-50257

when Jonas placed the certificate proceeds in Crystal City's general fund, he did not intend to pay Siemens anything, even though Siemens was contractually entitled to over two million dollars from the city. Jonas contends that this finding is clearly erroneous because Siemens received partial payment from Crystal City. But while the payments received by Siemens reduced the actual loss that it suffered, those payments did not necessarily reduce the loss that Jonas purposely sought to inflict.[7] We therefore conclude that the district court did not clearly err when determining the amount of loss attributable to Jonas and applying a 16-level enhancement.

## VII.

Finally, we conclude that the 420-month sentence imposed by the district court was substantively reasonable. "We review the substantive reasonableness of the sentence under an abuse-of-discretion standard." *United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015). While a sentence outside of a defendant's sentencing range under the Guidelines does not enjoy a presumption of reasonableness, we still "give due deference to the district court's decision that the [18 U.S.C.] § 3553(a) factors, on a whole, justify the extent of the variance." *Gall v. United States*, 552 U.S. 38, 51 (2007). A district court imposing an upward variance must, however, "thoroughly articulate its reasons," which "should be fact-specific and consistent with the sentencing factors enumerated in [18 U.S.C. § 3553(a)]." *United States v. Herbert*, 813 F.3d

---

[7] For the first time on appeal, Jonas argues that the partial payments to Siemens should reduce the intended loss because those payments qualify as "money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). The fatal flaw with this argument—beyond Jonas's failure to present it to the district court—is that the record does not indicate that Jonas's wire-fraud offenses were undetected when the partial payments to Siemens occurred. On the contrary, the PSR indicates that the federal investigation into public corruption in Crystal City began in 2014, whereas the first payment to Siemens took place in April 2015.

551, 562 (5th Cir. 2015) (quoting *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006)).

At the sentencing hearing, the woman who took over as Crystal City's city manager following Jonas's arrest and indictment gave a victim impact statement. In that statement, she described how Jonas's mismanagement of Crystal City led to "financial ruin," how Jonas's arrest and indictment led the city to be "red-flagged by the state . . . from receiving any grants whatsoever," and how the issuance of the certificates of obligation "sealed the city's death" because the city was "never financially viable for that" much debt. Additionally, the city manager alleged that Jonas fired city employees who would not do the "[i]llegal things" that Jonas "wanted them to do," which caused Crystal City to lose "a lot of good people that would have kept the city going if he had not terminated them."

The district court found this victim impact statement "very persuasive," and the statement convinced the district court that a sentence within the Guidelines range would not be adequate. The district court explained: "To hear how badly you left that city is shocking at best, Mr. Jonas. . . . But to fire people from their jobs because they wouldn't engage in the conduct that you wanted, that's -- that definitely wasn't taken into account by the guidelines." The district court tied these considerations to some of the § 3553(a) sentencing factors, specifically "the nature and circumstance of the offenses, the seriousness of the offenses, the history and characteristics of the defendant, the need to promote respect for the law, and to provide just punishment for the offenses." Given the district court's clear articulation of its reasoning and the deference we owe to its evaluation of the § 3553(a) factors, we cannot conclude that the district court abused its discretion when sentencing Jonas to 420 months of imprisonment.

No. 18-50257

## VIII.

For the foregoing reasons, we AFFIRM the judgment of the district court.