# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39973**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonathan M. MARTINEZ**
Airman (E-2), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 6 April 2022

————————————

*Military Judge:* Bryon T. Gleisner (motions); Mark W. Milam.

*Sentence:* Sentence adjudged on 13 August 2020 by GCM convened at Hurlburt Field, Florida. Sentence entered by military judge on 18 September 2020: Dishonorable discharge, confinement for 36 months, reduction to E-1, and a reprimand.

*For Appellant:* Major Ryan S. Crnkovich, USAF; Stephen I. Vladeck, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

*Amicus Curiae for Appellant:* Barbara E. Bergman, Esquire; Donald G. Rehkopf, Jr., Esquire—on behalf of the National Association of Criminal Defense Lawyers.

Before LEWIS, POSCH, and ANNEXSTAD, *Appellate Military Judges*.

Senior Judge LEWIS delivered the opinion of the court, in which Senior Judge POSCH and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

LEWIS, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of wire fraud, two specifications of attempted wire fraud, one specification of wrongful use of marijuana, and one specification of communicating a threat, in violation of Articles 134, 80, 112a, and 115, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 934, 880, 912a, 915.[1,2] Appellant was sentenced by military judge to a dishonorable discharge, 36 months of confinement,[3] reduction to the grade of E-1, and a reprimand. The convening authority took no action on Appellant's sentence.

Appellant raises four issues for our consideration: (1) whether the military judge violated Appellant's Fifth Amendment[4] and Sixth Amendment[5] rights by denying a defense request for an instruction that a guilty verdict required unanimity; (2) whether the wire fraud and attempted wire fraud convictions were legally and factually insufficient; (3) whether the wire fraud and attempted wire fraud convictions were preempted; and (4) whether Fifth Amendment equal protection guaranteed Appellant a unanimous verdict on the wire fraud and attempted wire fraud offenses.[6]

Appellant's first issue is raised in light of *Ramos v. Louisiana*, __ U.S. __, 140 S. Ct. 1390 (2020). Prior to trial, the Defense filed a written motion requesting a unanimous verdict instruction, arguing such an instruction was required by the Fifth Amendment's Due Process Clause, the Sixth Amendment's right to a unanimous jury verdict, and the implicit equal protection guarantee in the Fifth Amendment. The Government opposed the motion. The military judge denied the motion in a written ruling and subsequently instructed the

---

[1] Unless otherwise specified, all references to the UCMJ, the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.). The wire fraud and attempted wire fraud specifications incorporated 18 U.S.C. § 1343.

[2] The court members acquitted Appellant of one specification of wrongful use of cocaine and one specification of negligent discharge of a handgun, alleged as violations of Articles 112a and 134, UCMJ, 10 U.S.C. §§ 912a, 934.

[3] The confinement terms ran concurrently and varied from a low of no confinement for the wrongful use of marijuana specification to a high of 36 months of confinement for the wire fraud and communicating a threat specifications.

[4] U.S. CONST. amend. V.

[5] U.S. CONST. amend. VI.

[6] Appellant personally raises issue (4) pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A. 1982). We have reworded the issues slightly.

court members that a conviction resulted if three-fourths of the members (six of eight) voted to convict. *See* Article 52, UCMJ, 10 U.S.C. § 852. The military judge did not poll the court members on whether the findings verdict was unanimous. *See* R.C.M. 922(e) (prohibiting polling of members about their deliberations and voting except in specific, limited circumstances).[7]

On appeal, Appellant raises similar constitutional arguments to the ones raised at trial. In Appellant's view, *Ramos* makes clear that the right to unanimous verdict is an essential aspect of the right to an impartial jury. Appellant cites *United States v. Lambert*, 55 M.J. 293, 295 (C.A.A.F. 2001), which applied the Sixth Amendment requirement that the "jury be impartial" to court-martial members' selection, conduct during proceedings, and deliberations.[8] Appellant connects *Ramos*, *Lambert*, and other precedents[9] together to argue the military judge's non-unanimous verdict instruction violated the Constitution.[10]

The Government answers that the military judge did not err, the Sixth Amendment right to a jury trial does not apply to courts-martial, *Ramos* did not overturn that precedent, and that our court must strictly follow the decisions of higher courts. The Government reminds us that we should leave the role of overruling precedent to the higher court that published the precedent.

Amicus argues a non-unanimous verdict for a serious offense tried in a non-capital court-martial within the territorial limits of the United States violates the Sixth Amendment. According to amicus, when Congress statutorily provided for a non-unanimous verdict, it contravened "what the Constitution commands," namely, a unanimous verdict. Amicus also alleges a procedural error

---

[7] Mil. R. Evid. 606(b) prohibits a court-martial member from testifying during an inquiry into the validity of a finding or sentence except for three limited circumstances, specifically, whether: (1) extraneous prejudicial information was improperly brought to the members' attention; (2) unlawful command influence or any other outside influence was improperly brought to bear on any member; or (3) a mistake was made in entering the finding or sentence on the respective forms.

[8] The United States Court of Appeals for the Armed Forces did not address unanimity of verdicts in *Lambert*. At that time, Article 52, UCMJ, 10 U.S.C. § 852, required concurrence of two-thirds of the members for a finding of guilty in a non-capital court-martial. *See Manual for Courts-Martial, United States* (1995 ed.).

[9] For example, "[a]s a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (citations omitted).

[10] Appellant also proposes a narrower ground for requiring a unanimous verdict. According to Appellant, "at the Founding, [he] would only have been subject to trial [for these offenses] in a federal civilian court," if at all. We find this argument does not warrant further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

when the military judge's ruling assigned the burden of proof on the motion to Appellant, rather than the Government.

In issue (4), Appellant personally asserts that the unanimous verdict instruction was required for the wire fraud and attempted wire fraud offenses because Appellant was similarly situated to active duty military members prosecuted for those offenses in Article III courts. According to Appellant, the absence of a unanimous verdict requirement at his court-martial fails both a strict scrutiny and a rational basis of review.

We do not read *Ramos*, *Lambert*, and the other precedents in the same manner as Appellant. *Ramos* does not mention unanimity of verdicts in courts-martial. It did not analyze whether an impartial *jury* and impartial *court members* are identical under the Constitution. *Lambert* described the right to impartial court-martial members in three specific areas: selection, conduct during proceedings, and conduct during deliberations. *Lambert* says nothing about unanimity of a finding of guilt by such members. Indeed, the United States Court of Appeals for the Armed Forces (CAAF) affirmed the findings of guilt in *Lambert* even though Article 52, UCMJ, at that time, permitted a conviction by two-thirds of the voting members. The cited precedent also does not address whether Congress may use non-unanimous verdicts under its authority "To make Rules for the Government and Regulation of the land and naval Forces." U.S. CONST. art. 1, § 8, cl. 14. As the United States Supreme Court has said, "[T]he Constitution contemplates that Congress has 'plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline.'" *Weiss v. United States*, 510 U.S. 163, 177 (1994) (quoting *Chappell v. Wallace*, 462 U.S. 296, 301 (1983)). We find the military judge's ruling, which instructed the members consistent with the voting procedures in Article 52, UCMJ, was not error.

We considered the other arguments presented for issues (1) and (4); we find neither further discussion nor relief is warranted. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) (noting that lower courts should adhere to binding precedent and rely on superior courts to overrule their own precedents); *Whelchel v. McDonald*, 340 U.S. 122, 127 (1950) (noting the right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials by courts-martial or military commissions); *United States v. Easton*, 71 M.J. 168, 175 (C.A.A.F. 2012) (stating there is no Sixth Amendment right to trial by jury in courts-martial); *United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at *50–57 (A.F. Ct. Crim. App. 25 March 2022) (unpub. op.) (finding *Ramos* did not require unanimous court-martial verdicts).

After considering the remaining two issues, we find no error that materially prejudiced Appellant's substantial rights. We affirm the findings and sentence.[11],[12]

## I. BACKGROUND

Appellant's convictions for wire fraud and attempted wire fraud arose out of a scheme to trick three female enlisted Airmen at Hurlburt Field, Florida, into sending him nude digital photographs of themselves. Appellant knew the three women—AL, AW, and GMV—and their phone numbers. Appellant used this information to carry out his scheme.

In the scheme, Appellant would impersonate one of the three Airmen using a text messaging application or fake social media account. Appellant would

---

[11] Appellant requested speedy appellate review on 21 December 2021. He repeated that request twice, in two motions to cite supplemental authority, dated 4 January 2022 and 21 March 2022. This opinion was released within 18 months of docketing, and we find Appellant received a timely, full, and fair review of his findings and sentence. *See, e.g.*, *United States v. Arriaga*, 70 M.J. 51, 55–56 (C.A.A.F. 2011).

[12] In presentencing, the military judge admitted a record of nonjudicial punishment (NJP). *See* Article 15, UCMJ, 10 U.S.C. § 815; R.C.M. 1001(b)(2) (allowing personnel records to be introduced in sentencing under regulations of the Secretary concerned). Appellant received the NJP in December 2013 for a violation of Article 134, UCMJ, for conduct that was prejudicial to good order and discipline. Appellant received a suspended reduction in grade from Airman First Class (E-3) to Airman Basic (E-1) and a reprimand. After six months, the suspended punishment was remitted. NJP records may be admitted at a court-martial if "not over five years old on the date the charges were referred." Air Force Instruction 51-201, *Administration of Military Justice*, ¶ 12.26.2 (18 Jan. 2019). As referral was 30 March 2020, the admitted NJP was more than six years old. Trial defense counsel did not object, so we review for plain error. *See United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011). The military judge made a clear or obvious error in admitting the 2013 NJP. *See United States v. Lundby*, No. ACM S32500, 2019 CCA LEXIS 181, at *10 (A.F. Ct. Crim. App. 23 Apr. 2019) (unpub. op.); *United States v. Edwards*, 39 M.J. 528, 529 (A.F.C.M.R. 1994). Finding clear or obvious error, we test for prejudice by assessing whether the error substantially influenced the sentence. *See United States v. Griggs*, 61 M.J. 402, 410 (C.A.A.F. 2005). Other admitted sentencing exhibits from Appellant's personnel records included an NJP from January 2019 and an April 2019 vacation of suspended NJP. These two actions resulted in Appellant being reduced in grade from Senior Airman (E-4) to Airman First Class (E-3) in January 2019, and to Airman (E-2) in April 2019. Appellant did not raise this error or assert prejudice. Considering the convicted offenses before this court, the properly admitted evidence, and the 2019 NJP and vacation action offenses, we find the erroneous admission of the 2013 NJP did not substantially influence the military judge's adjudged sentence. Accordingly, Appellant is not entitled to relief.

state that the message was from a "new" phone number or account. Once contact was established, Appellant used information he knew to convince the targeted Airman that he was the other female Airman. In time, Appellant would claim the female Airman he was impersonating had been paid thousands of dollars to sell nude, lingerie, or similar photographs to a private subscription magazine. Appellant would then endeavor to convince the targeted Airman to sign up and send nude photos so she too could be paid thousands of dollars.

On 1 February 2019, Appellant targeted AL.[13] He impersonated AW using a text messaging application and successfully convinced AL to send him digital photographs, some of which depicted her nude. AL forwarded Appellant photos she already had on her phone, but also took and forwarded new photos when she got home from work. Some of the photos depicted AL wearing parts of her military uniform. AL also provided her bank account and routing number at Appellant's request so she could be paid via electronic funds transfer. Appellant promised AL she would receive the funds "tonight" if she provided her full name, date of birth, and a nickname for the private magazine to use to identify her. AL provided the requested information. After receiving the nude photos and bank information, Appellant sent AL this message:

> Ok so let's cut to the chase. Nudes are illegal in the military, nudes in uniform are illegal . . . . F.Y.I. this is not [AW] [face with laughing tears emoji] so from now on you do what I say when I say it or you get exposed to the entire base. I'll even make a craigslist and tinder of your nudes. If you tell anyone you go down with me soo keep that in mind. Now take a deep breath and relax. You do what your told your pictures are safe ok. You talk to anyone about this and I hear about it your exposed. You ignore me your exposed. You block me your exposed.[14]

From that point, Appellant required that every text message that AL sent back would call him "daddy." When AL did not comply, Appellant stated that she owed him additional pictures.

After receiving the threat to expose her photos, AL contacted the real AW and alerted her to the scheme. AL also notified the local Air Force Office of Special Investigations (AFOSI) detachment and reported what had happened. AFOSI agents requested AL respond to new messages while the AFOSI attempted to identify who was sending her messages.

---

[13] By the time of Appellant's trial, AL had separated from the Air Force.

[14] Quoted messages include misspellings and punctuation errors that we have not corrected. We made appropriate modifications using brackets.

Appellant targeted AW a few days after AL. He sent AW text messages and impersonated AL, stating that AL had a new phone number. Appellant attempted to convince AW to provide nude photos to the private magazine and to disclose her bank account information. He did not succeed, as AW already knew about the scheme from AL. AW feigned interest in providing photos in an attempt to determine who was messaging her. AW and AL confirmed that the same phone number messaged each of them.

Also in early February 2019, Appellant targeted GMV.[15] He impersonated AL by sending GMV a direct message from a fake social media account that he had created and populated with photos of AL. Appellant convinced GMV to text him on a "new" phone number, the same number he used in the scheme with AL and AW. Appellant attempted to convince GMV to send him nude photos for the private magazine. GMV, who was in Montana at the time, thought she was exchanging messages with the real AL. GMV shared private information in messages; however, she did not send any photos. The next day, GMV began to suspect that someone was impersonating AL. GMV called AL's boyfriend, who notified the AFOSI. Soon after, AFOSI agents conducted a phone interview of GMV and she explained to them what had happened.

About six weeks later, Appellant sent GMV a message from a different phone number, in which he threatened to expose her "secret." The "secret" was the private information GMV had shared. Appellant requested a "selfie cutie" or claimed he would tell "everyone." GMV responded "Haha, well expose away b[**]ch ain't nothing I'm hiding." Appellant responded, "well see about that."

Special Agent (SA) CC investigated the case for the AFOSI. SA CC determined that a North Carolina company leased the phone number that messaged AL, AW, and GMV. This company operated a downloadable texting application. According to SA CC, this texting application allowed a user to "choose any number you want or a number will be provided to you and that number will be different than your own number so the other person won't know who is texting you." SA CC obtained a warrant from a federal magistrate judge for the records held by the North Carolina company. This warrant resulted in the release of a series of Internet Protocol (IP) addresses used by the phone number. SA CC connected those IP addresses to an Internet service provider. SA CC subpoenaed records from the Internet service provider that showed one IP address was at Appellant's residence and another matched a location on Hurlburt Field near Appellant's primary workplace. SA CC also subpoenaed records related to the fake social media account of AL and the email address used to create that account. The email address used AL's name, though misspelled.

---

[15] By the time of Appellant's trial, GMV had separated from the Air Force.

In July 2019, AFOSI agents obtained search authorization for Appellant's electronic devices. AFOSI agents seized a cell phone and a tablet. An initial extraction of Appellant's phone conducted by the AFOSI revealed the photographs that AL sent on 1 February 2019.

SA CC forwarded Appellant's devices to the Department of Defense Cybercrime Center (DC3) for forensic analysis. Mr. BA, a digital forensics expert who testified at trial, examined Appellant's devices and their memory cards. Mr. BA testified that Appellant used an application on his phone that advertised the ability to password protect and hide photos and videos. Mr. BA also found a folder related to this application that contained AL's name, along with pictures of her. Additionally, the application utilized a "break-in alert feature," which took a photo if the wrong passcode was used to access the application. The DC3 examination showed one break-in alert from the application; the photo depicted Appellant.

Other forensic tools showed keywords associated with AL's name, the fake social media account of AL, and the email address associated with the fake social media account of AL. The phone number that messaged AL, AW, and GMV was also found along with its username, which was a misspelling of AL's name. Mr. BA also testified that Appellant's phone had an application installed that allowed simultaneous sign-ins to multiple accounts within one application. On the tablet, Mr. BA found multiple different email accounts signed in at the same time.

In addition to the above evidence and testimony, Appellant's civilian supervisor testified. Both Appellant and his supervisor worked in a different squadron than AL, AW, and GMV. However, the supervisor explained that Appellant talked about AL and AW while at work "the way a guy would talk about having like a crush on a girl," and stated that Appellant "would go out of his way to see them . . . if they were working."

The court members convicted Appellant of four offenses related to the scheme. These included: (1) wire fraud involving AL; (2) communicating a threat to injure the reputation of AL; (3) attempted wire fraud involving AW; and (4) attempted wire fraud involving GMV.

The court members also convicted Appellant of using marijuana. Two civilian witnesses testified that they saw Appellant smoking a blunt. One witness described the blunt as a cigar with the tobacco removed and replaced with marijuana.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Background

Before us, Appellant challenges the evidence supporting his wire fraud and attempted wire fraud convictions.[16] He quotes recent precedent of the Supreme Court of the United States that "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Kelly v. United States*, __ U.S. __, 140 S. Ct. 1565, 1573 (2020). He asserts that the scheme was to obtain copies of photographs—not the original property itself—that could be used as "non-pecuniary leverage." He correctly notes that there was no evidence that Appellant sold the photos of AL that he obtained. Appellant also argues that theoretically depriving victims of reputational value is insufficient to support a wire fraud conviction.

The Government answers that the evidence was legally and factually sufficient. It argues that AL had an exclusive property right in her photos stored on her phone and that AL gave up that exclusive control solely due to Appellant's deceitful conduct. According to the Government, AL trusted the person to whom she sent the photos to act as an agent to sell the photos to the private magazine. Instead, Appellant's scheme resulted in him obtaining the photos of AL for his personal use.

Appellant replies that the Government's exclusive property theory is contingent on Appellant depriving AL of an "intangible right" and the specification required proof of a scheme to obtain property in the form of nude photos.[17] Appellant also argues that any ambiguity in what "property" is covered by the wire fraud statute should be resolved in favor of lenity consistent with *Cleveland v. United States*, 531 U.S. 12, 25 (2000).

---

[16] Appellant does not challenge the sufficiency of the evidence underlying his convictions for communicating a threat and wrongful use of marijuana.

[17] Appellant argues in his reply brief that because he was charged with devising a scheme to obtain nude photographs, and "*not* some unalleged intangible right intimately bound up in these photographs," he lacked fair notice of the "exclusive rights" theory—and that this violated his due process right to know "under what legal theory" he would be convicted. *See United States v. Tunstall*, 72 M.J. 191, 192 (C.A.A.F. 2013). Appellant also argues the Government forfeited the right to make the "exclusive rights" argument when trial counsel stated "[Appellant] has not deprived [AL] of the photos" during an argument on a defense motion pursuant to a R.C.M. 917, which the military judge denied. We find these arguments do not warrant further discussion or relief. *See Matias*, 25 M.J. at 361.

For the attempted wire fraud convictions, Appellant argues there was insufficient evidence that either AW or GMV "took, much less sent, Appellant a picture over which they possessed exclusive control." For preexisting photos that AW or GMV may have possessed, Appellant asserts that the Government failed to prove that they retained exclusive control over such photos and had not already distributed them to another.

For the reasons expressed below, we find Appellant's wire fraud and attempted wire fraud convictions both legally and factually sufficient.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, the "standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. Our review "involves a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt," and we "must make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington,* 57 M.J. at 399. "The term reasonable doubt does not mean that the evidence must be free from conflict." *United States v. LeBlanc*, 74 M.J. 650, 654 (A.F. Ct. Crim. App. 2015) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

For the wire fraud specification involving AL, a violation of clause three of Article 134, UCMJ, based on the charge sheet, the Government had to prove beyond a reasonable doubt that: (1) at the time and place alleged, Appellant devised a scheme to defraud AL to obtain property by materially false and fraudulent pretenses and representations; to wit: impersonating AW to obtain

nude photographs; (2) that Appellant acted with the intent to defraud; and (3) in advancing, furthering, or carrying out the scheme, Appellant transmitted any writing, signal, or sound by means of a wire communication in interstate commerce in violation of 18 U.S.C. § 1343, an offense not capital. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 91.b.(3); 18 U.S.C. § 1343.

The federal wire fraud statute reads, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

"[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Neder v. United States*, 527 U.S. 1, 25 (1999). "In general, a false statement is material if it has a 'natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* at 16 (alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). "[T]he words 'to defraud' commonly refer 'to wronging one in [her] property rights by dishonest methods of schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *McNally v. United States*, 483 U.S. 350, 358 (1987) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). The mail fraud statute "had its origin in the desire to protect individual property rights." *McNally*, 483 U.S. at 358 n.8. The federal wire fraud statute is the "lineal descendant" of the mail fraud statute. *Id.* at 374 (Stevens, J., dissenting) (citation omitted).

The federal fraud statutes are "limited in scope to the protection of property rights" and do not "set[ ] standards of disclosure and good government for local and state officials." *Kelly*, 140 S. Ct. at 1571 (quoting *McNally*, 483 U.S. at 360). Fraud that implicates a state government's role as a sovereign wielding traditional police power, rather than its role as property holder, does not constitute property fraud. *See Kelly*, 140 S. Ct. at 1572; *see also Cleveland*, 531 U.S. at 22–23. A "State's intangible rights of allocation, exclusion, and control [of video poker licenses]—its prerogatives over who should get a benefit and who should not—do not create a property interest." *Kelly*, 140 S. Ct at 1572 (internal quotation marks and citation omitted).

For the attempted wire fraud specifications involving AW and GMV, a violation of Article 80, UCMJ, the Government had to prove beyond a reasonable doubt that: (1) at the time and place alleged, Appellant did certain overt acts, *inter alia* contacting AW and GMV and attempting to deceive AW and GMV into sending nude photographs by impersonating AL; (2) that the acts were done with the specific intent to commit wire fraud; (3) that the acts amounted to more than mere preparation; and (4) that the acts apparently tended to effect the commission of the intended offense except that AW and GMV did not send nude photographs to Appellant which prevented completion of the offense. *See MCM*, pt. IV, ¶ 4.b. "A person who purposely engages in conduct which would constitute the offense if the attendant circumstances were as that person believed them to be is guilty of an attempt." *MCM*, pt. IV, ¶ 4.c.(3) "For example . . . a person who reaches into the pocket of another with the intent to steal that person's billfold is guilty of an attempt to commit larceny, even though the pocket is empty." *Id.*

For the attempt offenses, the underlying wire fraud offense that Appellant must have had the specific intent to commit is similar to the wire fraud offense involving AL. The only significant differences are the names of the victims and the name whom Appellant impersonated.

### 3. Analysis

#### a. Wire Fraud – AL

A reasonable factfinder viewing the evidence in the light most favorable to the Prosecution could have determined all the essential elements of the wire fraud offense were proven beyond a reasonable doubt. The Government presented overwhelming evidence of Appellant's scheme to defraud AL by impersonating AW in order to obtain nude photographs of AL. Appellant used a text messaging application, which used the Internet, implicating wire communications. There was sufficient evidence that his messages moved in interstate commerce between at least Florida and North Carolina. The only significant question is whether the photos AL sent to Appellant were "property" under the wire fraud statute. A reasonable factfinder could have determined they were.

Appellant argues that AL only lost a copy of her photos. This is true in one sense; AL obviously still had access to the original digital photos. However, copy or original, Appellant obtained AL's property in the form of nude photos from his scheme. Simply because AL retained the original digital photos does not mean that AL's property loss was only an "incidental byproduct of the scheme." *See Kelly*, 140 S. Ct. at 1573. AL lost the property right to control the distribution of her nude photos. AL relinquished this property right because Appellant convincingly impersonated AW, falsely represented that the magazine paid AW, and induced a belief in AL that she would be paid thousands of

dollars in a direct deposit that night. Finally, *Kelly* states the "property must play more than some bit part in a scheme: It must be an object of the fraud." *Id.* (citations omitted). A reasonable factfinder could have determined that AL's photos were the object of the fraud. Appellant stored the pictures of AL on his phone using an application that hid them. Appellant's civilian supervisor testified that Appellant showed a "deep infatuation" for AL, which provides additional support that the object of his scheme was to obtain nude photographs of AL. Later, when Appellant thought AL did not answer his messages properly by calling him "daddy," he told her she owed him one thing—more photos. A reasonable factfinder could conclude that the scheme was to obtain AL's nude photos, which were property, and the photos were the object of the fraud, not merely some intangible non-property right.

Wire fraud convictions have been affirmed in the federal courts for intangible property. *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 26–27 (1987) (stating "[c]onfidential business information has long been recognized as property" and "exclusivity is an important aspect of confidential business information and most private property"); *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021) (endorsing a right to control theory of wire fraud because "a defining feature of most property is the right to control the asset in question"); *United States v. Hager*, 879 F.3d 550, 554 (5th Cir. 2018) (determining that exclusive use of proprietary, in-house software qualified as confidential business information, creating a property right that was protected by mail and wire fraud statutes). As the United States Court of Appeals for the Eleventh Circuit stated, "*McNally* and *Carpenter* teach that the mail and wire fraud statutes do not protect against fraudulent schemes involving intangible, non-property, non-monetary rights." *United States v. Belt*, 868 F.2d 1208, 1212–13 (11th Cir. 1989). The court in *Belt* found that wire fraud involving confidential bid information was sufficient to support a conviction. *Id.* at 1209–10. In doing so, the court "acknowledge[d] that convictions which rest solely on an intangible non-property rights theory should be vacated." *Id.* at 1213 (citations omitted).

The parties have not cited a federal case with a wire fraud scheme factually identical to Appellant's.[18] While our court has affirmed convictions under clause three of Article 134, UCMJ, incorporating the federal wire fraud statute,

---

[18] Appellant cites *United States v. Condolon*, 600 F.2d 7 (4th Cir. 1979). In *Condolon*, the appellant created a bogus talent agency to meet and seduce women in a scheme to gratify his sexual desires. *Id.* at 8. *Condolon* does not appear to involve a scheme with a property interest of nude photographs.

those cases also did not involve a scheme like this one.[19] Therefore, Appellant's challenges appear to raise an issue of first impression.

While the above federal cases involved intangible property of a business, we see no reason for a different result when the intangible property belongs to an individual, like AL.[20] The mail fraud statute, from which the wire fraud statute originated, "had its origin in the desire to protect individual property rights." *See McNally*, 483 U.S. at 358 n.8. We also agree with the United States Court of Appeals for the Second Circuit that a defining feature of most property is the right to control the asset. *Percoco*, 13 F.4th at 170. As the companies in *Belt* and *Hager* suffered a loss of control of their confidential bid information and proprietary software, AL suffered a loss of control of her private nude photos. We distinguish this case from the set-aside convictions in *Kelly* or *Cleveland*.[21] No state or federal sovereign acts were involved in the property rights in this case. This case involved AL's individual property right to control her nude, private photos, which she lost when she succumbed to Appellant's scheme to defraud. We need not determine whether AL's property right also required her to have and then relinquish "exclusive" control. The specification did not allege that fact and we find the property interest sufficient without the "exclusive" label. We conclude the Government was not required to prove exclusivity as an essential element of this wire fraud conviction.[22]

---

[19] *See e.g.*, *United States v. Walton*, No. ACM 40004, 2022 CCA LEXIS 133 (A.F. Ct. Crim. App. 28 Feb. 2022) (unpub. op.) (involving a scheme to defraud using wrongfully accessed social security numbers); *United States v. Gay*, 74 M.J. 736 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016) (involving a scheme by the appellant to defraud by using victim's personal information to open credit cards in victim's name).

[20] Moreover, to the extent the above cases discuss the potential economic value of the intangible property at issue, Appellant's messages to AL, AW, and GMV included a promise of an economic value of "thousands" of dollars for the photos.

[21] *See also Blaszczak v. United States*, __ U.S. __, 141 S. Ct. 1040 (2021); *Olan v. United States*, __ U.S. __, 141 S. Ct. 1040 (2021). The Supreme Court vacated and remanded both cases to the United States Court of Appeals for the Second Circuit in light of *Kelly*. These cases involved "misappropriating confidential nonpublic information from the Centers for Medicare & Medicaid Services [(CMS)]." *United States v. Blaszczak*, 947 F.3d 19, 26 (2d Cir. 2019), *vacated*, 141 S. Ct. 1040 (2021). CMS employees disclosed the agency's confidential information to a "political intelligence" consultant who tipped the information to employees of a healthcare focused hedge fund. *Id.*

[22] We do not decide the question of whether depriving a victim of "reputational value" is a property interest under the federal wire fraud statute. However, we note that Appellant was convicted of communicating a threat to injure AL's reputation under Article 115, UCMJ, 10 U.S.C. § 915. That statute reads, "Any person subject to this chapter

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction for wire fraud beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### b. Attempted Wire Fraud – AW and GMV

Appellant argues there is insufficient evidence that AW or GMV took or sent him photos over which they possessed exclusive control, and therefore his convictions for attempted wire fraud cannot stand. We disagree and find a reasonable factfinder could conclude that the Government proved the essential elements of both specifications of attempted wire fraud.

There was overwhelming evidence that Appellant committed overt acts in an attempt to devise a scheme where AW and GMV would send him nude photos. A reasonable factfinder could have concluded that Appellant's impersonation of AL over a texting application and a fake social media account, and his promises to AW and GMV that they would be paid money, were overt acts designed to deceive AW and GMV into sending him nude photographs. Similarly, there was reliable evidence in the messages and the witness testimony that showed Appellant's specific intent to commit the offense of wire fraud. A reasonable factfinder could have concluded the acts amounted to more than mere preparation and would have tended to bring about the commission of the offense of wire fraud.

We find Appellant's challenge that there was insufficient evidence of pre-existing nude photos misplaced. This is not an element of the charged attempted wire fraud offenses. As the example in the *MCM* provides, a would-be thief who believes a person has a wallet in their pocket and tries to steal it, but finds the person's pocket empty, has committed attempted larceny. It does not matter where the person's wallet actually is located. It does not matter whether the person owns a wallet. What matters is that the would-be thief believes the attendant circumstances to be that the person has a wallet in that pocket available for the would-be thief to steal. In this case, it does not matter whether AW and GMV had nude photos already taken and available to send to him as he impersonated AL. What matters is whether there was legally sufficient evidence that Appellant believed those attendant circumstances at the time of the charged offense. Viewing the evidence in the light most favorable

who wrongfully communicates a threat to injure the person, *property, or reputation* of another shall be punished as a court-martial may direct." (Emphasis added).

to the Prosecution, a reasonable factfinder could have determined Appellant had the requisite specific intent to commit wire fraud.

Appellant knew AW. He flirted with her, complimented her appearance, and went out of his way to visit her workplace. Appellant's civilian supervisor agreed Appellant could be reasonably described as having a "deep infatuation" with AW. In the messages, Appellant asked AW personal questions and shared some of the photos of AL he received from his earlier, successful scheme. AW already knew about the scheme from AL, but AW messaged Appellant that she was thinking about providing photos in an attempt to see if more information could be provided to the AFOSI. Considering the evidence presented at trial, a reasonable factfinder could have found Appellant had the requisite specific intent for the attempted wire fraud offense involving AW.

Appellant also knew GMV. Impersonating AL, Appellant reached out to GMV on a social media application that GMV described as a place where "you can post pictures" and "like each other's pictures or message each other." Appellant told GMV that AL received money from the private magazine and AW "signed up." GMV knew AW. Furthermore, GMV shared private information with Appellant, believing he was the real AL, and Appellant sent GMV the nude photos of AL as he tried to convince GMV to sign up and send him photos. GMV asked questions including why AL's face was depicted in her photos because GMV "didn't know . . . that the face was going to be in the picture." While the evidence did not show that Appellant had the same infatuation with GMV that he did with AL and AW, he certainly knew that his scheme to impersonate AL was working based on the private information that GMV shared with him. Given the nature and extent of the messages Appellant exchanged with GMV and the testimony of the witnesses, a reasonable factfinder could have concluded Appellant had the requisite specific intent to commit wire fraud by obtaining nude photos of GMV.

Turning to Appellant's "exclusive" control argument for the attempts, we find it unavailing for the same reasons we articulated for the wire fraud offense involving AL. The attempted wire fraud specifications did not allege the words "exclusive control" or imply that it was an essential element the Government had to prove beyond a reasonable doubt.

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions for attempted wire fraud involving AW and GMV beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

**B. Preemption**

Appellant argues that the wire fraud and attempted wire fraud specifications were preempted by Articles 106 and 121, UCMJ, 10 U.S.C. §§ 906, 921.[23] The Government argues that the UCMJ does not have a punitive article for wire fraud or a closely related offense.[24] It also argues Congress did not intend to occupy the field of fraud through Article 121, UCMJ, and that wire fraud does not consist of a residuum of the elements of larceny.

We conclude that Articles 106 and 121, UCMJ, did not preempt Appellant's wire fraud and attempted wire fraud convictions under Article 134, clause three, and Article 80, UCMJ.

**1. Law**

This court reviews questions of preemption de novo. *United States v. Benitez*, 65 M.J. 827, 828 (A.F. Ct. Crim. App. 2007) (citations omitted). "The 'preemption doctrine' limits the general article's expansive scope, prohibiting 'application of Article 134 to conduct covered by Article 80 through 132.'" *United States v. Avery*, 79 M.J. 363, 366 (C.A.A.F. 2020) (quoting *Manual for Courts-Martial, United States* (2012 ed.), pt. IV, ¶ 60.c.(5)(a)); *see also MCM*, pt. IV, ¶ 91.c.(5)(a).

In *United States v. Kick*, our superior court's predecessor, the United States Court of Military Appeals, defined the preemption doctrine as the

> legal concept that where Congress has occupied the field of a given type of misconduct by addressing it in one of the specific punitive articles of the code, another offense may not be created and punished under Article 134, UCMJ, by simply deleting a vital element. However, simply because the offense charged under Article 134, UCMJ, embraces all but one element of an offense under another article does not trigger operation of the preemp-

---

[23] Appellant raises this assignment of error "in the alternative" to his other assignments of error. We do not find Appellant's characterization of alternative assignments of error useful in this case and we see nothing in Rule 18 of the Joint Rules of Appellate Procedure for Courts of Criminal Appeals which permits raising assignments of error in the alternative. Additionally, we note that Appellant did not list Article 106, UCMJ, 10 U.S.C. § 906, in this assignment of error, though he extensively cites it and analyzes it in his brief. We assume the failure to mention Article 106, UCMJ, in this assignment of error was an oversight.

[24] The Government does not specifically address preemption under Article 106, UCMJ, in its answer. We will review whether the preemption doctrine applies under either UCMJ article.

tion doctrine. In addition, it must be shown that Congress intended the other punitive article to cover a class of offenses in a complete way.

7 M.J. 82, 85 (C.M.A. 1979) (citations omitted); *see also United States v. Erickson*, 61 M.J. 230, 233 (C.A.A.F. 2005).

Accordingly, the preemption doctrine only precludes prosecution under Article 134, UCMJ, where two elements are met: "(1) 'Congress intended to limit prosecution for . . . a particular area' of misconduct 'to offenses defined in specific articles of the Code,' and (2) 'the offense charged is composed of a residuum of elements of a specific offense.'" *United States v. Curry*, 35 M.J. 359, 360–61 (C.M.A. 1992) (omission in original) (quoting *United States v. McGuinness*, 35 M.J. 149, 151–52 (C.M.A. 1992)); *see also United States v. Wright*, 5 M.J. 106, 110–11 (C.M.A. 1978). We will "only find a congressional intent to preempt in the context of Article 134, UCMJ, where Congress has indicated 'through direct legislative language or express legislative history that particular actions or facts are limited to the express language of an enumerated article.'" *Avery*, 79 M.J. at 366 (quoting *United States v. Anderson*, 68 M.J. 378, 387 (C.A.A.F. 2010)).

"Article 134, UCMJ, expressly permits charging military members for 'crimes and offenses not capital' that are 'not specifically mentioned' in the UCMJ, and which include, inter alia, 'crimes and offenses prohibited by the United States Code.'" *United States v. Wheeler*, 77 M.J. 289, 291 (C.A.A.F. 2018) (quoting 10 U.S.C. § 934; *Manual for Courts-Martial, United States* (2012 ed.), pt. IV, ¶ 60.c.(4)); *see also MCM*, pt. IV, ¶ 91.c.(4). It is "indeed permissible to incorporate violations of noncapital federal crimes through clause three of Article 134, UCMJ." *Wheeler*, 77 M.J. at 293. It is permissible for the Government to incorporate "a specific federal statute aimed with precision at a particular type of intentional conduct with its own evidentiary burden." *Id.* (citing *Curry*, 35 M.J. at 361). However, the Government may not turn "to a hypothetical federal noncapital crime that lessened its evidentiary burden at trial by circumventing the mens rea element or removing a specific vital element from an enumerated UCMJ offense." *Id.*

The elements of an Article 106, UCMJ, 10 U.S.C. § 906, impersonation offense involving intent to defraud are: (1) that the accused impersonated an officer, noncommissioned officer, or petty officer, or an agent of superior authority of one of the armed forces, or an official of a certain government, in a certain manner; (2) that the impersonation was wrongful and willful; and (3) that the accused did so with the intent to defraud a certain person or organization in a certain manner. *MCM*, pt. IV, ¶ 39.b. The maximum punishment for this offense is a dishonorable discharge, forfeiture of all pay and allowances, and confinement for three years. *MCM*, pt. IV, ¶ 39.d.(1).

18

The elements of an Article 121, UCMJ, larceny by obtaining offense are: (1) that the accused wrongfully obtained certain property from the possession of the owner or of any other person; (2) that the property belonged to a certain person; (3) that the property was of a certain value, or of some value; and (4) that the obtaining by the accused was with the intent to permanently deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or for any person other than the owner. *MCM*, pt. IV, ¶ 64.b.(1). The maximum punishment for larceny of property of a value of $1,000.00 or less is a bad-conduct discharge, forfeiture of all pay and allowances, and confinement for one year. *MCM*, pt. IV, ¶ 64.d.(1)(a). If the property is non-military and of a value of more than $1,000.00, the maximum punishment is a dishonorable discharge, forfeiture of all pay and allowances, and confinement for five years. *MCM*, pt. IV, ¶ 64.d.(1)(c).

As described above, the maximum confinement term for wire fraud under 18 U.S.C. § 1343 is 20 years.

**2. Analysis**

### a. Article 106, UCMJ

The first step in the preemption analysis is to determine whether Congress intended to limit prosecution for all impersonation offenses involving intent to defraud to Article 106, UCMJ. This requires assessing the "direct legislative language or express legislative history" of Article 106, UCMJ. *See Avery*, 79 M.J. at 366.[25] As Appellant has not cited any express legislative history, we will focus on the direct legislative language.

Appellant argues that impersonation offenses with an intent to defraud exclude impersonation of those enlisted members below the grade of a noncommissioned officer. We agree with this general sentiment. We find support in both the plain language of Article 106, UCMJ, and the enumerated Article 134 offense that criminalized this conduct prior to 1 January 2019. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 86. Additionally, at the time of Appellant's offenses, neither AL nor AW were noncommissioned officers in the United States Air Force (E-5 or above).

---

[25] "American military law has criminalized 'impersonating an officer' via the 'General Article' since the 1775 Articles of War." REPORT OF THE MILITARY JUSTICE REVIEW GROUP 789 (22 Dec. 2015) (citation omitted), https://ogc.osd.mil/Portals/99/report_part1.pdf. Effective 1 January 2019, Congress implemented the Military Justice Review Group's recommendation to "migrate" the enumerated Article 134 offense to a punitive article, Article 106, UCMJ. *See id*. at 790.

However, the specifications in this case are not mere impersonation offenses. This is not a case where the Government charged Appellant with a novel Article 134 offense and removed the noncommissioned officer element. Instead, the Government charged wire fraud and attempted wire fraud, where the impersonation was just part of the scheme to defraud. We see no evidence that Congress, through direct legislative language or express legislative history, intended to legislate Article 106, UCMJ, to criminalize wire fraud schemes that involve impersonation as a part of the broader scheme.

Turning to the second step in the preemption analysis, we find the charged wire fraud and attempted wire fraud offenses do not compose a residuum of elements of Article 106, UCMJ. First, the charged offenses required use of a wire communication, an essential element. Second, the wire fraud offense required Appellant to "devise a scheme" and the attempted wire fraud offenses required him to commit acts "with the specific intent to commit wire fraud." There is no requirement for the Government to prove a "scheme" or "specific intent to commit wire fraud," under Article 106, UCMJ.

We conclude that it was permissible for the Government to incorporate 18 U.S.C. § 1343, "a specific federal statute aimed with precision at a particular type of intentional conduct"—wire fraud—"with its own evidentiary burden"— use of the wire communications and a scheme to defraud. *See Wheeler*, 77 M.J. at 293. We observe no lowering of the required mens rea by the Government's use of the wire fraud statute; both charged offenses and Article 106, UCMJ, required proof beyond a reasonable doubt of a specific intent to defraud. Therefore, Appellant's Article 106, UCMJ, preemption claim must fail.

### b. Article 121, UCMJ

Appellant cites two decisions of the Court of Military Appeals to argue that Congress intended to limit prosecutions for wrongfully obtaining property using false pretenses to Article 121, UCMJ. The first decision stated, "An examination of the legislative history of Article 121 discloses that it was the clear intent of Congress to create the single offense of 'larceny,' and to abolish the technical distinctions theretofore existing among the crimes of larceny, embezzlement, and taking under false pretenses." *United States* v. *Antonelli*, 35 M.J. 122, 125 (C.M.A. 1992). The second—and earlier—decision stated, "We are persuaded, as apparently the drafters of the Manual were, that Congress has, in Article 121, covered the entire field of criminal conversion for military law." *United States* v. *Norris*, 8 C.M.R. 36, 39 (C.M.A. 1953).

The Government answers with two points: (1) wire fraud is not a crime of conversion but one that focuses on the scheme and the use of wire communications; and (2) even if Congress originally intended to consolidate all "criminal conversion offenses," the substantial revisions in 2016 show it abandoned that

approach. On its second point, the Government notes that (1) Article 121a, UCMJ, 10 U.S.C. § 921a, criminalizes the fraudulent use of credit cards and debit cards; (2) Article 121b, UCMJ, 10 U.S.C. § 921b, criminalizes the obtaining of services through fraud; and (3) Article 124, UCMJ, 10 U.S.C. § 924, criminalizes frauds against the United States. The Government also argues that wire fraud does not consist of a residuum of the elements of larceny.

The first step in our preemption analysis is to determine whether Congress intended to limit prosecution for a particular area of misconduct to offenses defined in specific articles of the UCMJ. As we see it, the particular area of misconduct in this case was the scheme to defraud through wire communications to obtain property. We observe no "direct legislative language or express legislative history," *see Avery*, 79 M.J. at 366, in the current version of Article 121, UCMJ, to conclude that Congress intended to limit wire fraud offenses to prosecutions under the larceny punitive article.

We acknowledge the statements in *Antonelli* and *Norris* regarding the legislative history of Article 121, UCMJ. However, neither case involved preemption or the federal wire fraud statute.[26] We are not persuaded that Congress intended to limit prosecution for obtaining property via a scheme to defraud over a wire communication to Article 121, UCMJ.

Moving to the second step in the preemption analysis, the charged wire fraud and attempted wire fraud offenses do not compose a residuum of elements of Article 121, UCMJ. Under Article 121, UCMJ, there is no requirement for the Government to prove use of wire communication, a "devise a scheme" element, or a "specific intent to commit wire fraud" element. Additionally, we observe no lowering of the required mens rea by the Government's use of the wire fraud statute. The charged offenses and Article 121, UCMJ, both required proof beyond a reasonable doubt of a specific intent to defraud.

We also note that the United States Navy-Marine Corps Court of Criminal Appeals rejected the argument that the federal bank fraud statute, 18 U.S.C. § 1344, was preempted by Article 121, UCMJ. *See United States v. Tenney*, 60 M.J. 838 (N.M. Ct. Crim. App. 2005). Our sister service court determined *inter alia* that the bank fraud statute required the Government to prove an additional element—that the appellant defrauded a financial institution—and this showed there was not a residuum of the elements of larceny. *Id*. at 843.

---

[26] The offense of stealing mail was an enumerated Article 134, UCMJ, offense until 1 January 2019, when it became an offense under Article 109a, UCMJ, 10 U.S.C. § 909a. *See MCM*, pt. IV, ¶ 46; *Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 93.

For these reasons, Appellant's Article 121, UCMJ, preemption claim fails. It was permissible for the Government to incorporate 18 U.S.C. § 1343, "a specific federal statute aimed with precision at a particular type of intentional conduct with its own evidentiary burden." *See Wheeler*, 77 M.J. at 293.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.[27]

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[27] The certified transcript omits one Article 39(a), UCMJ, 10 U.S.C. § 839(a), session conducted on 12 August 2020. The audio recording of this session is contained in the original record of trial. At this less-than-five-minute session, the military judge discussed instructions and a government request for judicial notice. The Government's error in omitting the transcript for appellate review does not render the record of trial incomplete. *See* R.C.M. 1112(b)(1) and (d)(2). Additionally, we note that two audio recording files of the proceedings were not playable, though the certified transcript includes those proceedings. Appellant has not requested correction of the record of trial or claimed material prejudice. We find correction of the record unnecessary. We find no prejudice because we were able to perform our Article 66, UCMJ, 10 U.S.C. § 866, duties using a combination of the playable audio recordings and the certified transcript.